891 A.2d 673 (2006)
383 N.J. Super. 270
George D'ANNUNZIO, Plaintiff-Appellant, and
George D'Annunzio, D.C., Professional Association, Plaintiff,
v.
PRUDENTIAL INSURANCE COMPANY OF AMERICA, Prudential Property and Casualty Insurance Company of New Jersey, Art Ryan, Roger Desjadon, Franklin Baggett, Tony Locastro, Linda Fraistat, Frank Hruska and Kathy Savvas, Defendants-Respondents, and
Tom Mooney and First Managed Care Options, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued December 5, 2005.
Decided February 23, 2006.
*675 William O. Crutchlow argued the cause for appellants (Eichen Levinson, attorneys; Mr. Curtchlow, on the brief).
J. Michael Riordan argued the cause for respondents (Bressler, Amery & Ross, attorneys; Mr. Riordan and Paul Castronovo, on the brief).
Before Judges A.A. RODRÍGUEZ, C.S. FISHER and YANNOTTI.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we determine whether a chiropractor hired by an insurance company to review medical records is an employee entitled to the protection and remedies provided by the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. We conclude that CEPA's definition of "employee" turns on the employer's "control and direction" of the worker and, thus, does not foreclose the likelihood that a worker, who might be classified as an independent contractor at common law, may qualify as an employee for CEPA purposes. As a result, we reverse the summary judgment that dismissed plaintiff's CEPA claim.

I
Plaintiff George D'Annunzio, a licensed chiropractor, contracted with defendant Prudential Property and Casualty Insurance Company (PRUPAC) to work in PRUPAC's Personal Injury Protection (PIP) Department as a chiropractic medical director. After six months, PRUPAC terminated the agreement, asserting that plaintiff acted unprofessionally and failed to follow instructions.
*676 Plaintiff filed suit against PRUPAC and various PRUPAC representatives, namely: Art Ryan, PRUPAC's chairman and chief executive officer, Roger Dejaron, PRUPAC's chief operations officer, Franklin Baggett, a PRUPAC vice-president, Tony LoCastro, director of PRUPAC's PIP department, Linda Fraistat, unit manager of the PIP department, Frank Hruska, PRUPAC's operations manager, and Kathy Savvas, a claims supervisor in PRUPAC's PIP department. Plaintiff asserted that PRUPAC and its representatives terminated him in violation of CEPA in retaliation for his complaints that PRUPAC took part in unethical and illegal practices. Plaintiff also alleged that in terminating their relationship, PRUPAC breached the contract.[1]
PRUPAC moved for summary judgment, claiming (1) plaintiff was not eligible to commence a CEPA action because he was an independent contractor and not an employee, and (2) PRUPAC did not breach the contract. The trial judge agreed. An order memorializing the trial judge's oral decision was entered on December 21, 2004.
On appeal, plaintiff does not seek our review of the trial judge's ruling on his breach of contract claim. He does, however, contend that the trial judge erred in granting summary judgment on the CEPA claim. Specifically, plaintiff contends that the trial judge erroneously concluded that he was an independent contractor and not an employee for CEPA purposes, and that the judge mistakenly held that this distinction made a difference with regard to his ability to commence and maintain a CEPA action. We agree that the summary judgment entered in PRUPAC's favor must be reversed.

II
In resolving the parties' dispute about the scope of the term "employee" as it is defined in CEPA, our obligation is to ascertain the Legislature's intent. DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005); Young v. Schering Corp., 141 N.J. 16, 25, 660 A.2d 1153 (1995). Naturally, in this process, we are initially required to search for the legislative intent in the wording of the statute. O'Connell v. State, 171 N.J. 484, 488, 795 A.2d 857 (2002). The language utilized by the Legislature, as the Supreme Court instructs, is generally "the best indicator" of the Legislature's intent. DiProspero, supra, 183 N.J. at 492, 874 A.2d 1039.
CEPA defines "employee" as including "any individual who performs services for and under the control and direction of an employer." N.J.S.A. 34:19-2(b). In ascertaining the legislative intent, we conclude that CEPA's definition of "employee" does not necessarily exclude workers who might be classified at common law as independent contractors, and that CEPA's definition does not incorporate all the factors that define the term "employee" in other contexts. Instead, in outlining the parameters of the definition contained in CEPA, we hold that the primary focus is on the employer's "control and direction" of the worker's performance of services for the employer, and not on (1) the terms of compensation, (2) the extent to which the employer provides benefits to the worker, or (3) whether the worker *677 provides services for a full week or only part of a week.
Despite the fact that CEPA's definition of "employee" does not expressly exclude independent contractors and despite the fact that CEPA defines "employee" differently than in other contexts, PRUPAC argues that we should follow Pukowsky v. Caruso, 312 N.J.Super. 171, 711 A.2d 398 (App.Div.1998). In Pukowsky we poured content into the term "employee," for purposes of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, and determined that it excluded independent contractors.
PRUPAC's argument that we should follow the LAD's approach, however, is misplaced. The LAD prohibits discrimination by an "employer," N.J.S.A. 10:5-5(e), and, in defining "employee," states only that the term "does not include any individual employed in the domestic service of any person," N.J.S.A. 10:5-5(f). Certainly, the LAD's express definition of "employee" is broad, but its scope was also tempered by similar federal statutes and prior interpretations. That is, in light of federal decisions that interpreted Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to 2000-17, and federal decisions that interpreted not only the LAD but similar anti-discrimination laws enacted in other states, we determined in Pukowsky that "independent contractors are not to be considered `employees' within the meaning of the LAD, and are therefore not entitled to avail themselves of its protections." 312 N.J.Super. at 180, 711 A.2d 398. Since our Supreme Court has held that the construction given to Title VII of the Civil Rights Act represents "a key source of interpretive authority" for construing the terms of the LAD, Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97, 570 A.2d 903 (1990), in staking the parameters of the LAD's definition of "employee" in Pukowsky we adopted the test that appears to have originated in Spirides v. Reinhardt, 613 F.2d 826, 832 (D.C.Cir.1979); see also EEOC v. Zippo Mfg. Co., 713 F.2d 32, 37 (3rd Cir.1983); Franz v. Raymond Eisenhardt & Sons, Inc., 732 F.Supp. 521, 528 (D.N.J.1990), and held that the following factors should be weighed in determining whether a worker is an employee within the meaning of N.J.S.A. 10:5-5(f):
(1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupationsupervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.
[Pukowsky, supra, 312 N.J.Super. at 182-83, 711 A.2d 398.]
In Chrisanthis v. County of Atlantic, 361 N.J.Super. 448, 456, 825 A.2d 1192 (App. Div.2003), we followed Pukowsky in considering plaintiff's status and right to pursue a discrimination claim, but emphasized that the test required "more than the listing of factors on either side of the ledger with victory going to the side garnering the most factors." Instead, we said that "[a] `principled application' of the factors and a consideration of which factors are more important under the peculiar circumstances of each case are required." Ibid. PRUPAC argues that the Pukowsky factors should be utilized in determining whether a worker is an "employee" within the meaning of CEPA. The trial judge agreed with this approach, but we do not.
*678 In rejecting the use of the Pukowsky test for CEPA purposes, we initially recognize that the wording of the LAD's definition of "employee" contained in N.J.S.A. 10:5-5(f) varies from the wording of CEPA's definition of "employee" contained in N.J.S.A. 34:19-2(b). In addition, our interpretation of the LAD's definition in Pukowsky was also tempered by the prior federal history of this and other anti-discrimination laws. CEPA, on the other hand, has no federal antecedents that represent a source of interpretive authority. CEPA was intended to vindicate different public interests than the LAD, so it does not necessary follow that CEPA's definition of "employee" should follow in lock-step with the definition contained in the LAD.
In focusing on the main question posed by this appealwhether "independent contractors" may also fall within CEPA's definition of "employee"we observe that the Legislature did not expressly exclude independent contractors. This fact has particular significance because, as a matter of statutory construction, we are to assume that the Legislature is cognizant of its laws as well as the tools of construction employed by courts. See, e.g., Brewer v. Porch, 53 N.J. 167, 174, 249 A.2d 388 (1969); Matawan Borough v. Monmouth County Tax Bd., 51 N.J. 291, 299-300, 240 A.2d 8 (1968). In following that approach, we observe that our Legislature has shown its ability to unambiguously exclude independent contractors from persons defined as employees in other contexts. For example, the term "employee" was defined in the Tort Claims Act as one who works for another "provided, however, that the term does not include an independent contractor." N.J.S.A. 59:1-3. It logically follows that if the Legislature had intended to exclude independent contractors from N.J.S.A. 34:19-2(b), it likely would have adopted language identical or similar to that employed in N.J.S.A. 59:1-3. The Legislature's determination not to utilize the wording contained in N.J.S.A. 59:1-3 when it described the scope of N.J.S.A. 34:19-2(b)like the dog that did not bark in the night[2]is persuasive evidence that the Legislature did not intend, for CEPA purposes, to exclude all independent contractors from its protection.
Instead, we conclude that CEPA's definition of "employee" not only has the capacity to include workers who may be classified at common law as independent contractors but that the definition should be construed broadly and principally focus on the "control and direction" factor expressly mentioned in N.J.S.A. 34:19-2(b). In short, in staking N.J.S.A. 34:19-2(b)'s parameters, we have endeavored to harmonize the Legislature's precise wording of the statute with CEPA's purposes. Service Armament Co. v. Hyland, 70 N.J. 550, 558-59, 362 A.2d 13 (1976); Petition of Singer Asset Finance Co., 314 N.J.Super. 116, 119, 714 A.2d 322 (App.Div.1998); see also N.J.S.A. 1:1-1 ("In the construction of the laws and statutes of this state . . . words and phrases shall be read and construed with their context. . . ."). In considering the Legislature's chief reasons for adopting CEPA, we reject PRUPAC's argument because we can find no reason to interpret the term "employee" narrowly or to exclude all independent contractors from its scope.
CEPA was enacted to provide "broad protections against employer retaliation" for workers whose whistle-blowing actions benefit the health, safety and welfare of the public, Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179, 707 A.2d 1000 *679 (1998), and, as remedial legislation, must be "construed liberally to effectuate its important social goal," Abbamont v. Piscataway Tp. Bd. of Educ., 138 N.J. 405, 431, 650 A.2d 958 (1994). In Higgins v. Pascack Valley Hospital, 158 N.J. 404, 420-21, 730 A.2d 327 (1999), the Court recognized that CEPA has been liberally construed so as to prohibit
employer retaliation against an employee who objects to an employer practice that violates a foreign country's public policy, as expressed in an industry safety guideline, even if the employee is unaware of the precise source of the public policy, Mehlman, supra, 153 N.J. at 188-90, 707 A.2d 1000; protects an employee who reports an illegal act of a minority partner, even if the partnership did not exist at the time of the wrongdoing, [citing Barratt v. Cushman & Wakefield, 144 N.J. 120, 128-30, 675 A.2d 1094 (1996)]; and permits an employee to pursue a common-law tort or contract claim that is distinct from the CEPA claim, Young, supra, 141 N.J. at 25-26, 660 A.2d 1153.
The Court added to this list of holdings, all of which were inspired by the broad purposes of CEPA, by determining in Higgins that CEPA permits a claim against an employer where an employee reports the misconduct of co-employees. 158 N.J. at 421, 730 A.2d 327. The Court further explained CEPA's overarching intent to provide broad protection to workers who report unlawful activities in the workplace by referring, in Higgins, to Governor Kean's statement when he signed the original CEPA bill into law:
It is most unfortunatebut, nonetheless truethat conscientious employees have been subjected to firing, demotion or suspension for calling attention to illegal activity on the part of his or her employer. It is just as unfortunate that illegal activities have not been brought to light because of the deep-seated fear on the part of an employee that his or her livelihood will be taken away without recourse.
[158 N.J. at 420, 730 A.2d 327 (quoting Office of the Governor, News Release at 1 (Sept. 8, 1986)).]
In considering the scope of N.J.S.A. 34:19-2(b) against this backdrop, we conclude that the term "employee" should not be diluted by the Pukowsky test because many of the Pukowsky factors have no relevance when compared to CEPA's purposes. In addition, we observe that Pukowsky's test is not in harmony with the simple definition provided by the Legislature in N.J.S.A. 34:19-2(b), particularly when a consideration of that definition is illuminated by the goals the Legislature sought to vindicate in enacting CEPA. That is, when considering the need for protecting employees from retaliation when they engage in the important activity of blowing the whistle on illegal activities in the workplace, it seems readily apparent that many of the Pukowsky factors should be disregarded, particularly those factors that relate only to the terms of compensation.
Take for example a worker, whose function is to sweep the floors of a drug manufacturer's plant, and who witnesses a foreman instruct other workers to dump buckets of potentially harmful materials into substances from which edible products are made. Is it likely that the Legislature intended that this worker should not be entitled to CEPA's protections merely because the drug manufacturer reported its weekly payments to that worker on an IRS 1099 form instead of a W-2? When considering the primary goals of CEPA, is it likely that the Legislature meant to exclude from CEPA's protection such a worker because sweeping the *680 floors is not "an integral part" of the employer's business, or because the employer has chosen not to allow that worker to accrue retirement benefits, or because the drug manufacturer does not pay social security taxes on behalf of that worker? Should it matter that the sweeper only works part-time? We can find nothing in CEPA's provisions, or in the reasons that generated its enactment, that would suggest the Legislature meant to create an environment that would chill such workers, whose terms of employment are marked by such features, from reporting unlawful activities in the workplace.
The Pukowsky factors we alluded to in the above example, if applied, would conflict with the legislative intent by unduly limiting the class of workers who may rely upon the protections of CEPA.[3] In its wisdom, the Legislature defined the scope of those workers entitled to CEPA's protections not by reference to the mode and manner of compensation but by requiring only proof that the worker "performs services for and under the control and direction of an employer." N.J.S.A. 34:19-2(b). We conclude that this broad description of protected workers should not be narrowed by judicially appending a test that excludes those who would be defined, at common law, as independent contractors, or by appending other discordant and disqualifying aspects of the worker's relationship to the employer that have no bearing on the "control and direction" requirement contained in N.J.S.A. 34:19-2(b). As a result, we hold that independent contractors are not necessarily excluded and that only the first ("the employer's right to control the means and manner of the worker's performance"), second ("the kind of occupationsupervised or unsupervised") fourth ("who furnishes the equipment and workplace") and seventh ("the manner of termination of the work relationship"), factors contained in Pukowsky, supra, 312 N.J.Super. at 182-83, 711 A.2d 398, have relevance, and we conclude that those factors provide an appropriate guide for identifying those workers who fit CEPA's definition of "employee."
*681 Our holding is particularly compelled by CEPA's primary purpose, which is to encourage workers to voice concerns about the unlawful activities of employers and co-workers. CEPA exhibits no particular interest in regulating the terms of the employer-worker relationship, except to preclude retaliation, when the worker acts in the interests of the health, safety and welfare of the public. Cf., Lisa J. Bernt, Wrongful Discharge of Independent Contractors: A Source-Derivative Approach To Deciding Who May Bring A Claim For Violation of Public Policy, 19 Yale L. & Pol'y Rev. 39, 40 (2000); Lewis L. Maltby & David C. Yamada, Beyond "Economic Realities": The Case For Amending Federal Employment Discrimination Laws to Include Independent Contractors, 38 B.C. L.Rev. 239, 259 (1997).
It is also important to recognize a recent, growing trend in the marketplace. In recent years, American companies have chosen to include in their workforce large numbers of workers, who either are independent contractors or are not given the benefits normally associated with what is normally considered to be employment. See, e.g., Vizcaino v. Microsoft Corp., 97 F.3d 1187, 1189-90 (9th Cir.1996), adhered to on rehearing en banc, 120 F.3d 1006 (9th Cir.1997), cert. denied, 522 U.S. 1098, 118 S.Ct. 899, 139 L.Ed.2d 884 (1998). As a general matter, it may be true that this approach has been adopted in order to allow "greater flexibility in staffing levels" by permitting a company's workforce to "expand when labor needs are high, and shrink rapidlywith minimal legal and economic consequenceswhen needs drop." Katherine M. Forster, Note, Strategic Reform of Contingent Work, 74 S. Cal. L.Rev. 541, 542 (2001). See also Andrea H. Brustein, Comment, Casual Workers and Employee Benefits: Staying Ahead of the Curve, 7 U. Pa. J. Lab. & Emp. L. 695 (2005); Kevin J. Doyle, Comment, The Shifting Legal Landscape of Contingent Employment: A Proposal to Reform Work, 33 Seton Hall L.Rev. 641 (2003). Beyond market considerations, it is conceivable that unscrupulous employers might also adopt this hiring approach to limit their exposure to lawsuits by reducing the number of persons who, because of the employer's withholding of benefits or other badges of "employment," would not be eligible to assert statutory claims. The adoption of the Pukowsky test for CEPA purposes would have the consequence of permitting employers to unilaterally reduce the number of their workers entitled to CEPA's benefits. Such employers could simply engage temporary workers or independent contractors, or decline to provide workers with the types of benefits that the Pukowsky court found relevant in defining what it means to be an "employee." Although the Legislature may not have contemplated this growing phenomenon in employment trends when it enacted CEPA, we believe that CEPA was intended to provide benefits to a broad class of workers, as demonstrated in the decisions of our Supreme Court. See Higgins, supra, 158 N.J. at 421, 730 A.2d 327 (CEPA protects a worker who reports the misconduct of employees); Mehlman, supra, 153 N.J. at 188-90, 707 A.2d 1000 (CEPA protects a worker who reports an employer practice that violates a foreign country's public policy); Barratt, supra, 144 N.J. at 128-30, 675 A.2d 1094 (CEPA protects a worker who reports the illegal act of a minority partner of an entity that had not been formed). We, thus, garner from the current realities of the marketplace an additional reason for applying a broader interpretation of N.J.S.A. 34:19-2(b) than the application of Pukowsky's test would allow.
By the same token, in rejecting the adoption of a test that would exclude *682 all independent contractors, all temporary workers, and all workers who are not permitted the employment benefits mentioned in the Pukowsky test, we recognize that CEPA was not intended to provide protection for all individuals with a working relationship with an employer, but only those vulnerable to retaliation. That is, some workers are contractually positioned in a way that frees them from the fear of termination or other forms of retaliation, and have no critical need for CEPA's protections. See, e.g., Casamasino v. City of Jersey City, 304 N.J.Super. 226, 241-42, 699 A.2d 697 (App.Div.1997) (holding that a tenured tax assessor was not entitled to pursue a CEPA action because he could only be removed from office by the Director of the Division of Taxation), rev'd on other grounds, 158 N.J. 333, 730 A.2d 287 (1999),[4]cross-appeal dismissed as improvidently granted, 162 N.J. 123, 741 A.2d 93 (1999). As our Supreme Court has said, CEPA "seeks to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper and unlawful exercise of authority of employers." Abbamont, supra, 138 N.J. at 418, 650 A.2d 958.
In setting parameters for the scope of "employee" in light of CEPA's overarching concerns, we not only find relevant the first, second and fourth Pukowsky factors because they closely relate to the "control and direction" requirement of N.J.S.A. 34:19-2(b), but we also conclude that the seventh Pukowsky factor ("the manner of termination of the work relationship") also has some bearing on a worker's inclusion within CEPA's definition of "employee." In this sense, we conclude that the level of "control and direction" required by CEPA includes a consideration of whether the employer had the ability to terminate the worker's relationship in a manner similar to the termination of an at-will employee. In this case, it is not disputed that plaintiff's contract allowed PRUPAC to terminate him for any or no reason on sixty days' notice; in that regard, his relationship with PRUPAC was hardly different from that of an at-will employee. See LePore v. National Tool and Mfg. Co., 115 N.J. 226, 227, 557 A.2d 1371 (1989) (holding that a union employee protected by a collective bargaining agreement was in no different position than an at-will employee and could similarly maintain an action for wrongful discharge for reporting workplace safety violations).
Accordingly, we hold that our courts are obligated to broadly and liberally apply the "control and direction" test prescribed in N.J.S.A. 34:19-2(b), in the sense outlined above, when determining whether a worker may maintain a CEPA action, and that our courts are not bound by the employee/independent contractor test, which was set forth in Pukowsky, urged by PRUPAC, and applied by the trial judge.

III
In adhering to the "control and direction" standard contained in CEPA's definition of "employee," N.J.S.A. 34:19-2(b), as illuminated by the first, second, fourth and seventh factors mentioned in Pukowsky, we conclude that the evidential material supplied to the trial judge precluded the entry of summary judgment in favor of PRUPAC.
In reaching this conclusion, we are required to closely examine the circumstances surrounding both the commencement, *683 performance and termination of plaintiff's relationship with PRUPAC. In scrutinizing the summary judgment entered in favor of PRUPAC, we view the evidential material that was before the trial judge in the light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995).

A
In January 2000, plaintiff was interviewed by defendant LoCastro, the head of PRUPAC's PIP Department, regarding a chiropractic medical director position. PRUPAC retained different types of medical professionals to serve as medical directors within their respective areas of practice in the PIP Department. Among other things, the PIP Department reviewed requests for pre-approval of treatment plans submitted by insureds pursuant to the Automobile Insurance Cost Reduction Act ("AICRA"), N.J.S.A. 39:6A-1.1 to -32.[5] Plaintiff and at least one other chiropractor were retained by PRUPAC as chiropractic medical directors.
PRUPAC also employed nurses as nurse case managers to review treatments and determine whether they should be approved as medically necessary. If the nurse manager believed a treatment was not medically necessary, she would refer the matter to a medical director, who would then make a written recommendation as to whether the treatment should be approved or denied. PRUPAC was not bound by the medical director's recommendation, however, as a nurse could also approve a treatment that the medical director recommended be denied.
LoCastro, who was in charge of AICRA compliance for PRUPAC, testified at his deposition that it was mainly his idea to retain medical directors as "in-house" independent contractors. He acknowledged that most insurance companies contracted with outside vendors to provide this service, but he decided to bring such professionals under the company's umbrella because:
I wanted the medical management group to be with the case worker group because there's constant interaction. I didn't want to have it via telephone or. . . via e-mail. . . . Another factor was we did a major cost analysis and we felt we could do it more efficiently and effectively had we vendored it out and been at the mercy of the vendor[']s charges. . . . Most importantly, . . . you could deny all you want, but you have to be able to defend your positions and if they have to testify at the various arbitrations or court hearings . . . I wanted to be more or less in control of my own destiny with regard to this group.

[Emphasis added.]
Plaintiff testified at his deposition that, when interviewed, he was told by LoCastro that, as a chiropractic medical director, plaintiff would be required: to determine the need for chiropractic care, testing and independent medical evaluations of PRUPAC insureds; to identify fraudulent practices and inappropriate referrals; and to assist PRUPAC's Special Investigation *684 Unit (the legal department that handled fraudulent cases).
After his interview with LoCastro, plaintiff had a second interview with Fraistat and her team. Fraistat was a nurse-manager in charge of the PIP Department and was the on-site manager responsible for day-to-day compliance with AICRA. LoCastro testified at his deposition that he, Fraistat and her team believed that plaintiff would "probably" be "a good fit for the position," and, when compared to other chiropractors that were interviewed, plaintiff was best suited for the position because he was interested in halting health care fraud.
Karen Wagner was also a nurse manager in the PIP Department and was subordinate to Fraistat. Wagner contacted plaintiff and offered him the position. She asked him to work twenty hours a week, from eight a.m. to noon, Monday through Friday, and indicated he would be paid $125 per hour, and for a minimum of four hours each day, regardless of the number of files he reviewed or the amount of time he actually spent reviewing files. Plaintiff told Wagner that he would rather work two full days and one morning each week, as that would allow him to see more patients in his private practice, but she refused this request.
PRUPAC then sent plaintiff a proposed medical director consultant agreement. In February 2000, plaintiff became a medical director for PRUPAC when he and LoCastro, on behalf of PRUPAC, signed an agreement. Plaintiff acknowledged that he entered into the agreement as a professional association (although it was understood that only plaintiff would be performing the services required by the contract) rather than personally because his accountant advised that "would be easier for tax purposes." Article II of the agreement recited that the parties did not intend the agreement "to create or be construed as creating any agency, partnership, joint venture or employer-employee relationship." The agreement also rendered plaintiff solely responsible for the payment of federal and state taxes.
Other than reviewing requests for medical treatment, the agreement obligated plaintiff to review treatments that had already been administered to insureds, to review files submitted by nurse managers for the purpose of negotiating a comprehensive treatment plan with health care providers, to determine whether PRUPAC should require an insured to undergo an independent medical examination, to provide guidance and direction to nurse managers, and to give testimony when needed regarding his medical evaluations. The agreement also required that plaintiff keep office hours at PRUPAC from eight a.m. to noon, Monday through Friday.
Plaintiff commenced working at PRUPAC on March 1, 2000. He was provided with a security pass and a "sign-in" sheet by which he was to provide an accounting of his billable hours. Plaintiff was told by Karen Wagner, a nurse manager, that he was to compute his hours on this sheet by dividing the hours that he worked each day by the number of files that he reviewed that day. Wagner also provided plaintiff with a document which listed his duties and work-flow, and which directed him to:
 Provide leadership and education to the case management staff.
 Review[] all claims that are presented by the case manager for medical appropriateness.
 Discuss with the treating provider the treatment plan as well as alternatives to be in compliance with the CarePaths set forth [in the AICRA regulations].

*685  Participate in the development, modification and monitoring of care guidelines.
 Participate in ongoing Peer Review including review of cases and discussion of findings and make recommendations with case managers and providers.
 Participat[e] in Data Analysis with emphasis on utilization of healthcare resources and indicators of quality.
 Provide in house coverage or be reasonably available by telephone to answer questions or speak with providers.
 . . . be oriented to the Principles and Procedures of Utilization Management, Case Management, URAC Standards, Peer Review and NJ PIP CarePaths.
 . . . maintain CME's as they pertain to his/her specialty, as well as Case Management, Utilization Management, Quality Management and Peer Review.
 . . . be trained [by PRUPAC] in the Clinical Review Criteria, inclusive of the NJ PIP Reform CarePaths, and . . . assess and assist in the development of new criteria as needed[,] . . . review the Clinical Review Criteria on a yearly basis (or sooner should a question arise), and make changes according to the accepted practice of the specialty.
 . . . be a participant in the Utilization Management Committee, Quality Management Committee, and any other committee that would require medical director attention.
 Review all cases in which a clinical determination to certify cannot be made by first level non-physician clinical reviewers.
The record also contains evidence of PRUPAC's control of plaintiff's daily activities. In this regard, PRUPAC directed plaintiff to perform or adhere to the following guidelines:
1. Check the medical director log. ([T]he case managers will identify the claims and the issues that need to be addressed). Locate the case manager and discuss the claims, document any issues on the referral form and sign off.
2. Once the case managers issues are resolved, the team leaders will have a log with old PIP Claims that need to be reviewed. Again, the process would be to have the case worker provide the medical director with the claim and a form that includes recommendations, resolution.
3. All IME issues will be reviewed by the medical director for referral and sign off[.] (An IME referral form will be attached to each file that will be presented).
4. New PIP Reform processes will be discussed.
5. Policies and Procedures will be developed by the Medical Director and final sign off from the legal department.
6. Clinical Guidelines will be reviewed by the medical director, initially as well as yearly.
7. All denials will be made by the medical director with signature and comments on the referral form.
8. Contacts with the treating providers should they have questions in reference to the denials made.
Once ensconced in the PIP Department, plaintiff was assigned his own cubicle, which exhibited an identifying name plate. PRUPAC provided him with all the supplies that he needed to do his job, such as a computer, a private telephone line, filing cabinets, an e-mail address, a mailbox, and supplies. PRUPAC further controlled plaintiff's performance in this regard by rejecting his request for an assistant, explaining that this was an expense PRUPAC was unwilling to assume. In *686 addition, plaintiff was precluded from forwarding e-mails received at PRUPAC to his home office or taking files home.
Evidence in the record also indicated that PRUPAC trained plaintiff on how to use the computer system, the program for recording billable time, the plan for implementing AICRA, the nurse case management system, and other PRUPAC policies and guidelines. In corresponding with treating physicians, PRUPAC required that plaintiff use its form letters; any deviation required pre-approval from plaintiff's superiors. All letters and faxes created by plaintiff while performing his services were on PRUPAC letterhead and identified him as chiropractic medical director, for the obvious reason that these communications were sent on PRUPAC's behalf.
PRUPAC's ability to control plaintiff's performance was further suggested by plaintiff's assertions that PRUPAC pressured him to meet its expected approval rate for treatment requests of seventy-five to eighty percent. While PRUPAC denied this, LoCastro did admit at his deposition that he expected seventy-five to eighty percent of requests to be approvedan expectation he conveyed to the medical directors:
And I was happy to see [the statistics when] we were in line with where the industry was [seventy-five to eighty percent approval rate], which was what the anticipation was. So when I had someone who was denying a majority [of requests] that would cause a concern to me because that wasn't the intent, that wasn't the inherent nature of the system.
Further, Savvas stated at her deposition that nurse managers stopped referring files to plaintiff because "he seemed to be denying most of the tests." She conveyed this to Fraistat, who asked her to "run numbers" on plaintiff's approval and denial rates.
Additionally, plaintiff alleged he "was repeatedly told and controlled on how to perform every aspect" of his job. For example, he said Fraistat told him to limit his review and recommendation to chiropractic issues, as he was not qualified to review or comment on any other matters. Plaintiff told her that he could not do that because he had to review all relevant information before making a recommendation. According to plaintiff, Fraistat took offense and told him that "if she played plaintiff's attorney, she would `chew [him] up.'" Fraistat denied telling plaintiff to limit his review to chiropractic matters but admitted telling him to limit his written recommendations to chiropractic matters, as other matters were "outside his scope of license." Fraistat also told plaintiff that his recommendations were too long and had to be limited to five lines or less. Plaintiff said he was unable to limit himself to a certain number of written lines because he had to adequately explain and justify his recommendations.
Fraistat also said that plaintiff improperly accused physicians of fraud in his written recommendations. When, in August 2000, plaintiff refused to abide by Fraistat's orders in this regard, she and Savvas had an "official counseling session" with him. According to a memo she wrote to plaintiff's "personnel file," Fraistat told plaintiff "that he was to do as I told him, that he was only to discuss or document or comment on chiro care. .... PERIOD ... that is what his role at Prudential was to be and that his documentation was to be 5 lines or less." Fraistat further insisted that if plaintiff could not follow those orders, "it could lead" to her recommendation of his termination.
When plaintiff continued to review and comment on files as he saw fit, Fraistat *687 recommended that Hruska, her immediate supervisor, begin interviewing other chiropractors for plaintiff's position and that PRUPAC invoke the termination clause in plaintiff's contract once a replacement was chosen. She also informed Hruska that nurse managers had stopped referring files to plaintiff because he denied most requests. Hruska forwarded this information to LoCastro, Hruska's direct supervisor, and said: "It would appear to be a `will versus skill' issue for [plaintiff]. He has the skill to do what we need" but he "apparently [does] not [have] the will in spite of what I consider more than ample opportunity to change." As a further result, LoCastro, Hruska, Fraistat, Savvas and plaintiff met on September 6, 2000, during which plaintiff was confronted with his refusal to grant more treatment requests and his refusal to abide by Fraistat's orders.
Pursuant to a memo that LoCastro wrote documenting what occurred at the September 6, 2000 meeting, LoCastro told plaintiff that in order to continue as PRUPAC's chiropractic medical director, he had to agree to work more closely with the nurse managers and apologize to them; to work with providers in agreeing on requested treatments; to identify "high volume chiropractors and consider meeting with them"; to work more closely with the Special Investigations and Litigations Unit concerning fraud cases; to provide training on chiropractic medicine to the Investigations and Litigations Unit; and to modify his hours to better suit PRUPAC's needs.
The next day, September 7, 2000, two nurse managers told Savvas that plaintiff had told them that, during the meeting, Fraistat tried to get him fired but that LoCastro was on his side and was going to transfer him to the Investigations Unit. Savvas reported this to Fraistat, who immediately called LoCastro to tell him. Shortly after Fraistat spoke to LoCastro, she called plaintiff and Savvas into her office and told plaintiff his contract was terminated because, according to LoCastro,

he was like going outside the scope of what we thought a person should be doing in that capacity. Like Prudential was really adamant on proper forms and documents and letters and he was out there creating things on his own that were falling outside the scope of our structured environment. Basically, he was not following any of the instruction that was given to him by management about, you know, what we expected in that capacity. Those were the gists of it. He wasn't interacting well with the nurses, who he had to interact with. What happened was he became ineffective because nurses were reluctant to go to him with cases.
[Emphasis added.]
After telling plaintiff that his contract would be terminated, Fraistat then escorted him to his cubicle, waited while he gathered his belongings, and escorted him out of the building. According to plaintiff, that was the same way in which PRUPAC severed its relationship with its employees.

B
In weighing these circumstances through an application of the Pukowsky test, the trial judge agreed with PRUPAC's position and held that plaintiff was not an employee. The judge found that the evidence tilted in PRUPAC's favor on most of the Pukowsky factors, i.e., the first (control), third (the level of the worker's skill), fifth (length of the relationship), sixth (method of payment), seventh (manner of termination), eighth (annual leave), ninth (whether the work is an integral part of the employer's business), tenth (retirement *688 benefits), eleventh (social security taxes), and twelfth (intent of the parties). The trial judge found that only the second (the work was supervised) and fourth (the employer provided the supplies) weighed in plaintiff's favor.
As we have held, the test applied by the trial judge has no logical bearing on whether an individual is an "employee" as defined by N.J.S.A. 34:19-2(b). Instead, in compliance with the express terms of that statute, we conclude that there are questions of fact as to whether plaintiff is an employee for CEPA purposesa question which must be resolved solely with regard to whether plaintiff "perform[ed] services for and under the control and direction of" PRUPAC. Ibid. As a result, the Pukowsky factors regarding the compensation arrangement between employer and workernamely, the sixth (method of payment), eighth (the availability of annual leave), tenth (whether the worker accrues retirement benefits), and eleventh (whether the employer pays social security taxes)all of which were relied upon by the trial judge in granting summary judgment were irrelevant to that determination. As explained above, these factors are irrelevant because the Legislature did not intend to subordinate the important goals of CEPA to the particular compensation method agreed upon by the parties.
We have also determined that other Pukowsky factorsi.e., the third (skill level of the worker), the fifth (the length of time in which the individual has worked for the employer), and the ninth (whether the work is an integral part of the employer's business)have no bearing on whether a worker fits the definition of employee in N.J.S.A. 34:19-2(b). There is nothing about CEPA's goals, and the manner in which they were vindicated in the provisions enacted, which would suggest that only skilled workers or only workers who have been employed for a considerable period of time are entitled to CEPA's protections. In this regard, we again observe that changes in the marketplaceparticularly the increase in the percentage of temporary employees and independent contractors in the workplacewould have a tendency to endanger CEPA's ability to serve its important social goals by shrinking the class of workers entitled to its protections if we were to apply these particular Pukowsky factors.
In addition, because we conclude that the common law definition of what constitutes an independent contractor has no bearing on the issue, we also reject the application of the twelfth Pukowsky factor, i.e., the intention of the parties. Here, we assume, for summary judgment purposes, that plaintiff, as he said, wanted to be considered an independent contractor for tax reasons. This intention adds nothing to the process of determining plaintiff's eligibility to commence a CEPA action; it instead merely incorporates other Pukowsky factors that we have determined have no legitimate bearing on the subject.
The first (the employer's right to control the means and manner of the worker's performance), second (whether the worker was supervised), fourth (the furnishing of equipment and a workplace) and seventh (manner of termination) factors mentioned in Pukowsky, we conclude, do bear on the question. When found and weighed, these factors provide insight into whether a plaintiff is an "individual who performs services for and under the control and direction of an employer," N.J.S.A. 34:19-2(b), and whether a plaintiff is "especially vulnerable in the workplace from the improper and unlawful exercise of authority of employers," Abbamont, supra, 138 N.J. at 418, 650 A.2d 958. In examining their application to the matter at hand, we note that the trial judge concluded *689 that the second and fourth factors weighed in plaintiff's favor. We have no cause to second guess those observations. The judge, however, concluded, as a matter of law, that the first (control) and seventh (manner of termination) factors were not satisfied. The record does not support those determinations. Instead, we conclude that there are questions of fact regarding both these factors that require our reversal of the summary judgment entered in favor of PRUPAC.
As for the control factor, the evidence we have outlined at length regarding PRUPAC's hiring, directing and firing of plaintiff provide proof of PRUPAC's efforts to control plaintiff's performance. Defendant LoCastro, at his deposition, stated that PRUPAC deliberately retained in-house medical professionals instead of engaging the services of professionals outside PRUPAC's offices because he "wanted to be more or less in control of [his] own destiny with regard to this group." Indeed, there was evidence in the record to suggest that plaintiff was terminated because "he was not following any of the instruction that was given to him by management." These statements, which came from PRUPAC's representatives, as well as the other evidence we outlined earlier, suggest that the first factor might ultimately be found by the finder of fact as weighing in favor of plaintiff's claimed status as an employee. In addition, we observe that plaintiff asserted in opposition to the motion that he "was repeatedly told and controlled on how to perform every aspect" of his job. Considering the familiar standards that govern the disposition of summary judgment motions, Brill, supra, 142 N.J. at 540, 666 A.2d 146, which we need not restate here, there was more than sufficient evidence in the record to create a question of fact as to whether plaintiff was an "individual who performs services for and under the control and direction of an employer." N.J.S.A. 34:19-2(b).
As for the manner of termination, we also conclude that there are questions of fact that should must be decided by the factfinder. If an employer is able to terminate a worker as if that worker was an at-will employee, regardless of whether that worker might be classified for common law or other statutory purposes as an independent contractor, it should follow that the individual is indistinguishable from a worker who requires the protection of CEPA when facing retaliation because of whistle-blowing activities. To satisfy this aspect of the test, the worker must demonstrate, as our Supreme Court has indicated, that he is the type of worker concerned that his "livelihood [would] be taken away" if he were to speak out about the employer's alleged unlawful activities. Abbamont, supra, 138 N.J. at 418, 650 A.2d 958. We have determined that a worker who is in a contractual relationship that permits the employer to discharge him for any or no reason may meet this requirement. The extent to which a worker is entitled to notice before being terminated (here, sixty days' notice was required) and the impact of termination brought about by the employer's exercise of that right for reasons prohibited by CEPA raises a question that must be resolved by the trier of fact.
Reversed and remanded for further proceedings in conformity with this opinion. We do not retain jurisdiction.
NOTES
[1] In addition, plaintiff claimed that defendant First Managed Care Options (FMCO), a company that contracted with PRUPAC to provide independent medical examinations for PRUPAC insureds, and Tom Mooney, FMCO's chief executive officer, tortiously interfered with his contract with PRUPAC. Plaintiff later voluntarily dismissed with prejudice his claims against FMCO and Mooney.
[2] Arthur Conan Doyle, Silver Blaze (1892).
[3] We thus find inaccurate the prediction in DaBronzo v. Roche Vitamins, Inc., 232 F.Supp.2d 306 (D.N.J.2002) that N.J.S.A. 34:19-2(b) would not be construed by New Jersey courts so as to include independent contractors. We note, also, that DaBronzo cited a few decisions of other state courts which have excluded independent contractors from the benefits of their whistle-blowing statutes. Although the opinions of courts of sister states may often provide guidance in resolving issues arising in our own State, we are not persuaded by these authorities. For example, DaBronzo cited Chilingirian v. City of Fraser, 200 Mich.App. 198, 504 N.W.2d 1 (1993), where the court held that an attorney who performed services for the city was an independent contractor not entitled to the benefits of Michigan's whistle-blowing statute, which defined "employee" as "a person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied," MCL 15.361(a). Chilingirian is enlightening only to the extent it recognized that this definition would permit a finding that a person fitting the common law concept of independent contractor could also fall within this definition of employee. 504 N.W.2d at 2. In addition, we are not persuaded by the unexplained dictum in Stephens v. Prudential Ins. Co. of Am., 278 A.D.2d 16, 717 N.Y.S.2d 144, 145 (2000) that New York's definition of employee in its whistle-blowing statute did not include the plaintiff because he "was clearly an independent contractor, not respondent's employee." We also will not follow McClure v. American Family Mut. Ins. Co., 29 F.Supp.2d 1046, 1061 (D.Minn.1998), aff'd, 223 F.3d 845 (8th Cir.2000) because its holding was based upon a definition of "employee" in Minnesota's whistle-blowing statute that expressly excluded independent contractors. See Minn.Stat. § 181.931(2) ("`Employee' means a person who performs services for hire in Minnesota for an employer. Employee does not include an independent contractor.").
[4] The Supreme Court reversed, determining that plaintiff was a de facto officer who had not attained tenure. 158 N.J. at 351, 730 A.2d 287.
[5] AICRA limits insurance coverage for automobile accident injuries to treatments that are "medically necessary." N.J.S.A. 39:6A-1.1. A treatment is medically necessary if it "is consistent with the clinically supported symptoms . . . [and] is the most appropriate level of service." N.J.A.C. 11:3-4.2. AICRA defines a medical director as a licensed doctor who reviews pre-approval requests and determines whether the requested treatment is medically necessary. N.J.A.C. 11:3-4.7(c)(1). Only a licensed medical doctor may deny coverage of a treatment as not medically necessary. N.J.A.C. 11:3-4.7(c)(4).