927 A.2d 113

GEORGE D'ANNUNZIO, D.C., PLAINTIFF–RESPONDENT, AND GEORGE D'ANNUNZIO, D.C., PROFESSIONAL ASSOCIATION, PLAINTIFF, v. PRUDENTIAL INSURANCE COMPANY OF AMERICA, PRUDENTIAL PROPERTY AND CASUALTY INSURANCE COMPANY, ART RYAN, CHIEF EXECUTIVE OFFICER OF PRUDENTIAL, ROGER DEJARON, CHIEF OPERATIONS OFFICER OF PRUDENTIAL, FRANKLIN BAGGETT, VICE PRESIDENT OF PRUDENTIAL PIP CLAIMS, TONY LOCASTRO, DIRECTOR OF PIP FOR PRUDENTIAL, LINDA

FRAISTAT, NEW JERSEY PIP UNIT, UNIT MANAGER FOR PRUDENTIAL, FRANK HRUSKA, PIP OPERATIONS MANAGER FOR PRUDENTIAL AND KATHY SAVVAS, CLAIMS SUPERVISOR FOR PRUDENTIAL, DEFENDANTS–APPELLANTS, AND TOM MOONEY, PRESIDENT OF FIRST MANAGED CARE OPTIONS, FIRST MANAGED CARE OPTIONS, JOHN DOES 1–100 (SAID NAMES BEING FICTITIOUS), JANE DOES 1–100 (SAID NAMES BEING FICTITIOUS) AND ABC CORPORATIONS 1–100 (SAID NAMES BEING FICTITIOUS), DEFENDANTS.

Argued January 4, 2007—Decided July 25, 2007.

112

*Lawrence R. Sandak,* argued the cause for appellants (*Proskauer Rose,* attorneys; *Mr. Sandak, Richard S. Reig* and *Kristin S. Rozic,* on the briefs).

*William O. Crutchlow,* argued the cause for respondent (*Eichen Levinson & Crutchlow,* attorneys).

*Keith J. Miller,* submitted a brief on behalf of *amicus curiae* Employers Association of New Jersey (*Robinson & Livelli,* attorneys; *Mr. Miller* and *John J. Sarno,* on the brief).

*Christopher P. Lenzo,* submitted a brief on behalf of *amicus curiae* National Employment Lawyers Association/New Jersey (*Green, Savits & Lenzo,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

New Jersey's Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8, protects workers who blow the whistle on their employers' illegal, fraudulent, or otherwise improper activities that implicate the health, safety, and welfare of the public. The statute extends to "any individual who performs services for and under the control and direction of an employer for wages or other remuneration." *N.J.S.A.* 34:19–2(b) (defining "[e]mployee[s]" entitled to CEPA protection). The question here is who is included in that definition. We have recognized previously that that definition is not limited to a narrow band of traditional employees. In this appeal, we reaffirm the appropriateness of the *Pukowsky*[1] test for assessing the status of an alleged "independent contractor" claiming protection as an "employee" under CEPA.

[1] *Pukowsky v. Caruso,* 312 *N.J.Super.* 171, 711 A.2d 398 (App.Div.1998).

## I.

The appeal comes to us on a summary judgment record that focused solely on the "independent contractor" versus "employee" issue. Because the defendants claimed an entitlement to judgment based on that record, we view the facts in the light most favorable to the party opposing that motion and, therefore, accord to plaintiff all favorable inferences that support his claim to CEPA's protection. *See R.* 4:46–2(c); *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

In February 2000, defendant Prudential Property and Casualty Insurance Company (Prudential) hired plaintiff George D'Annunzio as a chiropractic medical director in its Personal Injury Protection (PIP) Department. Prudential's PIP Department reviews and pre-approves treatment plans submitted by the doctors who treat Prudential's insureds and other covered claimants injured in automobile accidents. It is the responsibility of the medical directors and nurse case managers to determine whether the proposed treatments are medically necessary, consistent with the PIP reforms authorized by the Automobile Insurance Cost Reduction Act (AICRA), *N.J.S.A.* 39:6A–1.1 to –35. Insurers engage licensed medical professionals to provide independent medical judgments as to the medical necessity of treatment plans submitted for approval. *See N.J.S.A.* 39:6A–3.1(a); *N.J.A.C.* 11:3–4.7(c)(4).[2] Prudential opted to meet that requirement by having a

---

[2] *N.J.S.A.* 39:6A–3.1(a) allows an insured to elect an automobile insurance policy with PIP coverage and authorizes the insurer to review an insured's or other covered person's request for "reasonable and necessary treatment" for medical necessity. PIP insurers respond to requests for proposed treatment or testing at "decision points," which is part of the process of an insurer's "decision point review." *N.J.A.C.* 11:3–4.7 (requiring insurers to maintain "decision point review plan"); *see also N.J.A.C.* 11:3–4.3(a) (requiring insurers to provide PIP coverage for medically necessary treatment for individuals injured in covered accident); *N.J.A.C.* 11:3–4.5(d) (subjecting administration of certain tests also to decision point review). An insurer's decision point review plan is subject to review and approval by the Commissioner of Insurance and must provide for a physician's determination on the question of a treatment's medical necessity. *See N.J.A.C.* 11:3–4.7(c)(4) ("All determinations on treatments or tests shall be

cadre of licensed professionals in-house to perform the review function, but it designated those professionals as "independent contractors." Indeed, Prudential required every licensed medical director to maintain an active private professional practice and to agree that their hours billed to Prudential would not exceed fifty percent of their total professional practice.

Prudential sent D'Annunzio a one-year "Medical Director Consultant Agreement" that was described as "standard" for the position. For tax purposes, D'Annunzio executed the agreement in the name of his professional association (George D'Annunzio D.C.P.A.) rather than as a licensed individual, although the parties apparently agree that only a licensed individual could perform the tasks for which D'Annunzio was retained. Pursuant to the agreement, D'Annunzio was paid $125 per hour for twenty hours of work per week. D'Annunzio agreed to perform his services at a designated Prudential PIP claims office, Monday through Friday, from 8:00 a.m. until noon.

In respect of the relationship between the parties, the agreement stated that

> [t]he relationship between Prudential and the Medical Director is that of independent contractor. The Medical Director will maintain his own private practice and provide Medical Director services on a part time basis.... None of the provisions of this agreement are intended to create or be construed as creating any agency, partnership, joint venture or employer-employee relationship.
>
> As an independent contractor, [t]he Medical Director will have the sole responsibility for the payment of all self employment and applicable federal state and local taxes.

Both parties had the right to terminate the relationship without cause on sixty-days notice. Prudential also had the option of terminating the agreement immediately if D'Annunzio committed a material breach.

According to D'Annunzio, when he signed the agreement he expected to be permitted to perform his review function in an

---

based on medical necessity.... Denials ... on the basis of medical necessity shall be the determination of a physician.").

independent manner, as one might expect from a contractor of professional services. Instead, from his first day in Prudential's PIP Department, D'Annunzio found that Prudential sought to exert extensive control over him. D'Annunzio received a list of duties, workflow instructions, and a time sheet. The list of duties required that D'Annunzio (1) provide leadership and education to the staff; (2) review claims for medical appropriateness; (3) discuss treatment alternatives with doctors; (4) help to develop Prudential's care guidelines; (5) participate in peer reviews of colleagues; (6) participate in data analysis; and (7) provide in-house coverage through his physical presence or by being telephonically accessible during required hours. The workflow instructions included step-by-step directions for D'Annunzio to use in his review of PIP claims. In addition to requiring D'Annunzio to record his billable hours on Prudential's time sheet forms, other accouterments of the job appeared to D'Annunzio to be designed to make him essentially a cog in the machinery of Prudential's PIP Department.[3]

As it turned out, D'Annunzio's tenure with Prudential was short-lived. During the summer of 2000 he informed supervisors of his objection to insurance violations that he perceived were being perpetrated by Prudential and its employees. D'Annunzio allegedly expressed concern about Prudential's failure to pay MRI bills, its hiring of non-medical vendors to perform independent medical evaluations, and the improper use of nurse case managers in the approval of medical care. In August and early September,

---

[3] Prudential assigned D'Annunzio a Department workstation cubicle with an attached nameplate that read, "George D'Annunzio, D.C.," and provided him with a Prudential phone number, a Prudential organization e-mail address, an office mailbox, and office supplies. D'Annunzio was instructed to use Prudential letterhead on all written communications and facsimile transmissions involving PIP Department work. Prudential trained him in the use of its computer programs and directed that all documents be stored in the company's internal computer system. D'Annunzio was prohibited from removing files from the office for review anywhere else, including his home or professional office. Finally, but not least, D'Annunzio received training on Prudential's program of pre-certification of medical treatment plans, as approved for use under AICRA.

D'Annunzio's supervisors Kathy Savvas, Linda Fraistat, Frank Hruska, and Anthony LoCastro informed him that his performance was not meeting expectations. D'Annunzio was advised to speed up his review of treatment files, to limit his reviews to claims involving chiropractic evaluations, and to reduce the number of treatment plans that he was denying. On September 11, 2000, Prudential gave D'Annunzio written notice that it was terminating its agreement with him based on the sixty-day notice provision.

D'Annunzio [4] filed this action against Prudential, its parent company, as well as several officers and employees of Prudential. He alleged that he was fired because he had complained about Prudential's "lack of regulatory and contractual compliance" and that therefore his termination was in violation of CEPA. In addition, D'Annunzio asserted common law claims for breach of contract and wrongful discharge.[5]

Limited discovery was conducted, focusing on whether D'Annunzio qualified as an "employee" for CEPA purposes. On the parties' cross-motions for summary judgment, the trial court held in favor of the Prudential defendants. Applying the "*Pukowsky* test," the court concluded that D'Annunzio was an independent contractor not entitled to advance a claim under CEPA. D'Annunzio's other claims were dismissed also.

D'Annunzio appealed and the Appellate Division reversed. *D'Annunzio v. Prudential Ins. Co. of Am.*, 383 *N.J.Super.* 270, 276, 891 *A.*2d 673 (App.Div.2006). Also using the *Pukowsky* test as the paradigm for its analysis, the panel held that whether a professional person is an "employee" under CEPA's definition

---

[4] D'Annunzio brought the action both as an individual and in the name of his professional corporation.

[5] D'Annunzio also asserted a claim for tortious interference against First Managed Care Options, a company that contracted with Prudential to perform independent medical evaluations. That claim against the company and its president was dismissed voluntarily with prejudice.

must hinge more on the degree of "control and direction" exercised by the employer over the professional worker under the circumstances, and less on the lack of financial arrangements indicative of a traditional employee. *Id.* at 277, 891 *A.*2d 673. It found that the record was replete with evidence suggesting that Prudential controlled and directed D'Annunzio, *id.* at 290–94, 891 *A.*2d 673, and concluded therefore that the entry of summary judgment for defendants was in error, *id.* at 298, 891 *A.*2d 673. The matter was remanded to the trial court. *Ibid.*

We granted Prudential's petition for certification, 186 *N.J.* 608, 897 *A.*2d 1062 (2006), and now affirm the panel's judgment.

## II.

New Jersey's "conscientious employee" protection policy has as its genesis the decision of this Court in *Pierce v. Ortho Pharmaceutical Corp.*, 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980), where we held that an at-will employee, wrongfully discharged in violation of "a clear mandate of public policy," has a common law cause of action against an employer. Following *Pierce*, the Legislature enacted CEPA, codified at *N.J.S.A.* 34:19–1 to –8. CEPA is remedial social legislation designed to promote two complementary public purposes: " 'to protect and [thereby] encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.' " *Yurick v. State*, 184 *N.J.* 70, 77, 875 *A.*2d 898 (2005) (quoting *Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 *N.J.* 405, 431, 650 *A.*2d 958 (1994)). Specifically, in this dispute we are called on to address the scope of CEPA's protection of "employees" from retaliatory employment action.

Our goal in the interpretation of a statute is always to determine the Legislature's intent. *Wollen v. Borough of Fort Lee*, 27 *N.J.* 408, 418, 142 *A.*2d 881 (1958). To decipher that intent, we look first to the plain language of the statute, *Lane v. Holderman*, 23 *N.J.* 304, 313, 129 *A.*2d 8 (1957), and we ascribe to the statutory language its ordinary meaning, *DiProspero v. Penn,*

183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). "It is not the function of this Court to 'rewrite a plainly-written enactment of the Legislature [ ]or presume that the Legislature intended something other than that expressed by way of the plain language.'" *Ibid.* (quoting *O'Connell v. State,* 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002)). When the plain language of a statute is susceptible to multiple interpretations, however, then recognized principles of statutory construction allow resort to extrinsic tools to determine the Legislature's likely intent. *See Aponte-Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 323, 744 *A.*2d 175 (2000).

■ CEPA prohibits an employer from taking adverse employment action against any "employee" who exposes an employer's criminal, fraudulent, or corrupt activities. *N.J.S.A.* 34:19–3. It authorizes an aggrieved employee to bring a civil suit against an employer who retaliates in violation of the statute. *N.J.S.A.* 34:19–5. Workers are thus protected from retaliation and employers are deterred from activities that are illegal or fraudulent, or otherwise contrary to a clear mandate of public policy concerning the safety, health, and welfare of the public. *See N.J.S.A.* 34:19–3; *Mehlman v. Mobil Oil Corp.,* 153 *N.J.* 163, 179, 707 *A.*2d 1000 (1998). When enacted, CEPA was "the most far reaching 'whistleblower statute' in the nation." *Mehlman, supra,* 153 *N.J.* at 179, 707 *A.*2d 1000. A single guiding principle has instructed our interpretation of CEPA in the decades since its enactment. As broad, remedial legislation, the statute must be construed liberally. *See generally Feldman v. Hunterdon Radiological Assocs.,* 187 *N.J.* 228, 239, 901 *A.*2d 322 (2006); *Yurick, supra,* 184 *N.J.* at 77, 875 *A.*2d 898; *Higgins v. Pascack Valley Hosp.,* 158 *N.J.* 404, 420, 730 *A.*2d 327 (1999); *Abbamont, supra,* 138 *N.J.* at 417, 650 *A.*2d 958.

CEPA defines an "employee" as

any individual who performs services for and under the control and direction of an employer for wages or other remuneration.

[*N.J.S.A.* 34:19–2(b).]

The question is who is included in that definition. As the Appellate Division noted, the definition does not exclude, explicitly, persons who are designated as independent contractors performing services for an employer for remuneration.[6] *D'Annunzio, supra,* 383 *N.J.Super.* at 279, 891 *A.*2d 673. It is beyond cavil that it includes more than the narrow band of traditional employees. In *Feldman, supra,* 187 *N.J.* at 241, 901 *A.*2d 322, when we considered the term's application in the context of a shareholder-director of a professional corporation, we specifically instructed courts to "look to the goals underlying CEPA and focus not on labels but on the reality of plaintiff's relationship with the party against whom the CEPA claim is advanced." *See also MacDougall v. Weichert,* 144 *N.J.* 380, 388, 677 *A.*2d 162 (1996) (emphasizing same for *Pierce* wrongful discharge claim).

Our courts have long recognized that, in certain settings, exclusive reliance on a traditional right-to-control test to identify who is an "employee" does not necessarily result in the identification of all those workers that social legislation seeks to reach. As was aptly described by former Judge Conford in a dissent that later was relied on by this Court,

> while some measure of control is essential to a finding of an employer-employee relationship, there are various situations in which the control test does not emerge as the dispositive factor. For example, where it is not in the nature of the work for the manner of its performance to be within the hiring party's direct control, the factor of control can obviously not be the critical one in the resolution of the case, but takes its place as only one of the various potential *indicia* of the relationship which must be balanced and weighed in determining what, under the totality of the circumstances, the character of that relationship really is. Thus, the requirement of control is sufficiently met where its extent is commensurate with that degree of supervision which is necessary and appropriate, considering the type of work to be

---

[6] The reference to "remuneration" for services suggests that contracted providers also can meet the definition even though they are not paid "wages" for their services, so long as a fitting "control and direction" test is included in the review of the relationship. "Remuneration" is defined as "the act of remunerating" and therefore includes more than the payment of wages. *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1631 (2001). To "remunerate" is "to pay, recompense, or reward for work, trouble, etc." and "to yield a recompense for work or services." *Id.* at 1630–31.

done and the capabilities of the particular person doing it. Patently, where the type of work requires little supervision over details for its proper prosecution and the person performing it is so experienced that instructions concerning such details would be superfluous, a degree of supervision no greater than that which is held to be normally consistent with an independent contractor status might be equally consistent with an employment relationship. In such a situation the factor of control becomes inconclusive, and reorientation toward a correct legal conclusion must be sought by resort to more realistically significant *criteria.*

[*Marcus v. E. Agric. Ass'n, Inc.,* 58 *N.J.Super.* 584, 597, 157 *A.*2d 3 (App.Div.1959) (Conford, J., dissenting) (internal citations omitted), *rev'g on dissent,* 32 *N.J.* 460, 161 *A.*2d 247 (1960).]

■ Taken out of context, labels can be illusory as opposed to illuminating.[7] When CEPA or other social legislation must be applied in the setting of a professional person or an individual otherwise providing specialized services allegedly as an independent contractor, we must look beyond the label attached to the relationship. The considerations that must come into play are three: (1) employer control; (2) the worker's economic dependence on the work relationship; and (3) the degree to which there has been a functional integration of the employer's business with that of the person doing the work at issue. *See Lowe v. Zarghami,* 158 *N.J.* 606, 615–18, 731 *A.*2d 14 (1999). The test for determining those aspects of a non-traditional work relationship was set out in *Pukowsky* and we have already indicated our acceptance of that test as appropriate for CEPA purposes. In *Feldman, supra,* in which our dissenting colleague joined, we referenced *Pukowsky* as the standard for determining the inde-

---

[7] As the amici's submissions in this matter demonstrate, it is a fundamental fact of business life that an employer has two ways to get work done: through an independent contractor or through an employee. The definition of one's employment status ultimately must take form by distinguishing an employee from an independent contractor. Differing consequences flow from that demarcation from one setting to another. However, in each setting-specific analysis, what matters most is that an individual's status be measured in the light of the purpose to be served by the applicable legislative program or social purpose to be served. Thus, scholars and courts acknowledge that the test for an employer-employee relationship differs when one examines for tort-based vicarious liability purposes, for example, or for social legislation purposes such as for workers' compensation coverage. *See* 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 60.04 (2006).

pendent-contractor status of an individual claiming entitlement to bring a CEPA action. 187 *N.J.* at 242, 901 *A.*2d 322.

In *Pukowsky,* the Appellate Division identified twelve factors to be considered when determining whether a plaintiff qualifies as an employee for purposes of the New Jersey Law Against Discrimination (LAD):

> (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation—supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.
>
> [312 *N.J.Super.* at 182–83, 711 *A.*2d 398 (quoting *Franz v. Raymond Eisenhardt & Sons, Inc.,* 732 *F.Supp.* 521, 528 (D.N.J.1990)).]

The *Pukowsky* test is a hybrid that reflects the common law right-to-control test, *see Restatement (Second) of Agency* § 220 (1957) (setting forth control test for assessing whether master-servant relationship is established under common law agency principles creating liability obligations), and an economic realities test, *Pukowsky, supra,* 312 *N.J.Super.* at 182–83, 711 *A.*2d 398. The *Pukowsky* test focuses heavily on work-relationship features that relate to the employer's right to control the non-traditional employee, and allows for recognition that the requisite "control" over a professional or skilled person claiming protection under social legislation may be different from the control that is exerted over a traditional employee. An employer cannot be expected to exert control over the provision of specialized services that are beyond the employer's ability. Yet, the work may be an essential aspect of the employer's regular business.

Therefore, the test further allows for examination of the extent to which there has been a functional integration of the employer's business with that of the person doing the work. Several questions elicit the type of facts that would demonstrate a functional integration: Has the worker become one of the "cogs" in the employer's enterprise? Is the work continuous and directly re-

quired for the employer's business to be carried out, as opposed to intermittent and peripheral? Is the professional routinely or regularly at the disposal of the employer to perform a portion of the employer's work, as opposed to being available to the public for professional services on his or her own terms? Do the "professional" services include a duty to perform routine or administrative activities? If so, an employer-employee relationship more likely has been established.

Finally, the test includes consideration of the worker's economic dependence on the employer's work, but does not insist on the same financial indicia one might expect to be present in the case of a traditional employee, such as the payment of wages, income tax deductions, or provision of benefits and leave time. Workers who perform their duties independently may nevertheless require CEPA's protection against retaliatory action when they speak against or refuse to participate in illegal or otherwise wrongful actions by their employer. Such individuals should benefit from CEPA's remedies. Moreover, CEPA's deterrent function would be undermined if such individuals were declared ineligible for its protection. The public at large benefits from a less restricted approach to who may sue under CEPA as an employee of a business enterprise. It is unlikely to us that the Legislature meant to sanction a restricted approach to CEPA's reach.

### III.

A reasonable application of CEPA's definition of "employee" should include adjustment for the modern reality of a business world in which professionals and other workers perform regular or recurrent tasks that further the business interests of the employer's enterprise, notwithstanding that they may receive remuneration through contracts instead of through the provision of wages and benefits. Therefore, in order that CEPA's scope fulfill its remedial promise, the test for an "employee" under CEPA's coverage must adjust to the specialized and non-traditional worker who is nonetheless integral to the business interests of

the employer. We reaffirm that the *Pukowsky* test fulfills that purpose. The test is familiar and addresses most routine questions in respect of the status of an individual as either an independent contractor or employee. It also offers consistency because the test is known and has been subject to general application. *See, e.g., Kounelis v. Sherrer,* 396 *F.Supp.*2d 525, 532–33 (D.N.J. 2005) (applying *Pukowsky's* factors in CEPA action by inmate claiming "employee" status).

In this matter, the trial court and Appellate Division resorted to the *Pukowsky* criteria when addressing D'Annunzio's status under CEPA with differing outcomes. *D'Annunzio, supra,* 383 *N.J.Super.* at 294–97, 891 *A.*2d 673. The Appellate Division concluded that the trial court erred when it granted summary judgment to defendants because the court did not properly weigh the factors in the light of a professional services work relationship. The panel emphasized the importance of "the employer's 'control and direction' of the worker's performance of services for the employer. . . ." *Id.* at 277, 283, 891 *A.*2d 673 (highlighting *Pukowsky* factors one, two, four, and seven). Accordingly, it focused on factors that examine the nature of the employer's right to control the work of a licensed professional, such as D'Annunzio—not the right to control the outcome, but rather to manage how that work is performed for the purposes of the employer's business operations. *Id.* at 283, 891 *A.*2d 673. The panel also attributed less weight than did the trial court to those factors that would produce evidence of traditional employee status, when applicable, such as payment of wages and benefits. *Ibid.*

We agree with the emphasis in the Appellate Division's analysis and add that the *Pukowsky* test also appropriately examines the relationship to determine whether the professional's services have been incorporated into the work of the business (factor nine), and looks at the impact of that work relationship on the professional's ability to offer his or her services to the public (the overall economic realities of the relationship beyond method of payment and provision, or not, of benefits and leave). As to the former, one

cannot help but note that D'Annunzio's treatment plan review function was an integral, indeed essential, aspect of Prudential's PIP Department's operations. Although Prudential may not have told him whether to approve or disapprove individual claims, the whole overlay of expectations placed on D'Annunzio made him a necessary part in its day-to-day operations. We glean that from the demand for his physical presence for half of the entire business workweek, spread over every business day, ensuring not only his professional discretionary judgment on individual cases, but also his ready availability to other professionals performing tasks for Prudential for consultation and educational purposes.

Moreover, D'Annunzio presented evidence that, although designated an independent contractor in his agreement with Prudential (a matter that we view as informative but not dispositive because the designation was stated by the parties to be for a purpose unrelated to CEPA's interests), his day-to-day activities were controlled in minute detail. The step-by-step instructions provided to him set forth every single particular as to how to review a claim, including direction on how much information to provide in his written reviews. Although that is not to say that a professional cannot be told to be succinct without converting him to the status of an employee under CEPA, D'Annunzio certainly can argue that he was essentially under the control of Prudential and that he was a veritable "cog" in the PIP Department's operations.

D'Annunzio's time spent at Prudential's operations was continuous, week to week, and daily, for a substantial period of time during business hours. That Prudential exacted a not-inconsequential amount of time from him, on its premises, caused D'Annunzio to be away from attending to his private practice. The impact on D'Annunzio cannot be said to be minor. Moreover, his duties included numerous administrative tasks, all to be performed in accordance with protocols devised by Prudential to meet their business plan for the review and approval of PIP treatment plans. In fact, all of the detailed requirements expected of D'Annunzio were in furtherance of Prudential's operation.

In sum, D'Annunzio pointed to many facts that support the creation of an employment relationship for CEPA purposes, notwithstanding that his agreement described him as an independent contractor. Therefore, and in view of the premature stage of these proceedings and the truncation of discovery, we agree with the Appellate Division panel that reversed the entry of summary judgment for Prudential and remanded the matter to the Law Division. In affirming the panel's judgment, we intend to express no opinion whatsoever on the merits of the substance of D'Annunzio's claimed CEPA violations.

## IV.

The judgment of the Appellate Division is affirmed as modified and the matter is remanded to the trial court.

Justice RIVERA–SOTO, dissenting.

The Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19-1 to -8, protects employees from enumerated retaliatory acts by their employers. Specifically, Section 3 of CEPA provides that "[a]n employer shall not take any retaliatory action *against an employee because the employee*" engages in whistle-blowing activity. *N.J.S.A.* 34:19-3 (emphasis supplied). It provides remedies to "an aggrieved employee or former employee," *N.J.S.A.* 34:19-5, and imposes on employers the duty to "conspicuously display, and annually distribute to all employees written or electronic notices of its employees' protections, obligations, rights and procedures under [CEPA], and use other appropriate means to keep its employees so informed[,]" *N.J.S.A.* 34:19-7.

In Section 2(b) of CEPA, *N.J.S.A.* 34:19-2(b), the Legislature defined an "employee" entitled to CEPA's protection as "any individual who performs services for and under the control and direction of an employer for wages or other remuneration." Acknowledging that "[t]he question here is who is included in that definition[,]" *ante*, 192 *N.J.* at 114, 927 *A.2d* at 115, the majority concludes that, "in view of the premature stage of these proceed-

ings and the truncation of discovery," *ante,* at 127, 927 *A.*2d at 123,[1] D'Annunzio may qualify as an "employee" under CEPA and, hence, the summary judgment entered in Prudential's favor by the trial court should be reversed. For two independent reasons, I respectfully dissent.

## I.

As a matter of statutory interpretation, there is no need to engage in the *Pukowsky*[2] analysis embraced by the majority. The requirement that a CEPA claimant be a defined "employee"—as opposed to an "independent contractor"—was imposed by the Legislature, not by judicial fiat. In that context, our role is limited:

> The "paramount [judicial] goal when interpreting a statute" is to determine and fulfill the legislative intent. *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005). To achieve that goal, we first look to the statutory language, *State v. Pena,* 178 *N.J.* 297, 307, 839 *A.*2d 870 (2004), and interpret the language in accordance with its plain meaning if it is " 'clear and unambiguous on its face and admits of only one interpretation.' " *State v. Thomas,* 166 *N.J.* 560, 567, 767 *A.*2d 459 (2001)

---

[1] Neither the "premature stage of these proceedings" nor the "truncation of discovery" provides a basis for the relief afforded. This matter was presented to the trial court on Prudential's motion for summary judgment on the sole issue of whether D'Annunzio qualified as an "employee" under CEPA. Regardless of the amount of discovery undertaken, there has been no claim that there were facts which were not presented and which, with additional discovery, could have been presented. More to the point, there is no showing in this record—and neither party has argued—that there are *any material* facts in dispute, a condition precedent to the overruling of a grant of summary judgment based on the factual record. *See Parks v. Rogers,* 176 *N.J.* 491, 502, 825 *A.*2d 1128 (2003) (explaining, in summary judgment context, that " '[i]t was not the court's function to weigh the evidence and determine the outcome but only to decide if a material dispute of fact existed' " (quoting *Gilhooley v. County of Union,* 164 *N.J.* 533, 545, 753 *A.*2d 1137 (2000))). Thus, unless the majority can sustain that, as a matter of law, the trial court erred—and the majority cannot—the trial court's judgment should be affirmed. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.").

[2] *Pukowsky v. Caruso,* 312 *N.J.Super.* 171, 711 *A.*2d 398 (App.Div.1998).

(quoting *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.2d* 399 (1982)). If the statute's language " 'is susceptible to different interpretations, the court considers extrinsic factors, such as the statute's purpose, legislative history, and statutory context to ascertain the legislature's intent.' " *Aponte-Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 323, 744 *A.2d* 175 (2000) (quoting *Twp. of Pennsauken v. Schad,* 160 *N.J.* 156, 170, 733 *A.2d* 1159 (1999)); *see also DiProspero, supra,* 183 *N.J.* at 492–93, 874 *A.2d* 1039; *State v. Pena, supra,* 178 *N.J.* at 307–08, 839 *A.2d* 870.

[*Thomsen v. Mercer-Charles,* 187 *N.J.* 197, 206, 901 *A.2d* 303 (2006).]

We have summarized our task thusly: "When interpreting a statute or regulation, we endeavor to give meaning to all words and to avoid an interpretation that reduces specific language to mere surplusage." *DKM Residential Props. Corp. v. Twp. of Montgomery,* 182 *N.J.* 296, 307, 865 *A.2d* 649 (2005) (citing *Franklin Tower One v. N.M.,* 157 *N.J.* 602, 613, 725 *A.2d* 1104 (1999); Norman J. Singer, *2A Sutherland Statutory Construction* § 46:06, at 190–92 (6th ed. 2000)). *See also Twp. of Holmdel v. N.J. Highway Auth.,* 190 *N.J.* 74, 107–08, 918 *A.2d* 603 (2007) (Rivera–Soto, J., dissenting) ("When interpreting a statute, our overriding goal must be to determine the Legislature's intent. We have explained that ordinarily, the language of the statute is the surest indicator of the Legislature's intent. When, as here, the language is plain and clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms. We also consider the overall legislative scheme, because our task is to harmonize the individual sections and read the statute in the way that is most consistent with the overall legislative intent." (citations, internal quotation marks, and editing marks omitted)).

An application of that canon of construction leads inexorably to the conclusion that the Legislature is no stranger to the differences between an employee and an independent contractor; it has repeatedly made a distinction between the two. Thus, in those instances when the Legislature has seen fit to do so, it has made the terms "employee" and "independent contractor" synonymous. *See, e.g., N.J.S.A.* 12A:3–405(a)(1) (providing that, in respect of employer's responsibility for forged endorsements on negotiable instruments, " '[e]mployee' includes an independent contractor and

employee of an independent contractor retained by the employer"); *N.J.S.A.* 17B:27A–17 (defining, for health insurance benefit purposes, "[e]ligible employee" to "include[ ] . . . an independent contractor, if the . . . independent contractor is included as an employee under a health benefits plan of a small employer"); *N.J.S.A.* 34:15-3 (providing, for purposes of Workers' Compensation Act, *N.J.S.A.* 34:15-1 to –69.3, that "[i]f an employer enters into a contract, written or verbal, with an independent contractor to do part of such employer's work . . . such contract . . . shall not bar the liability of the employer for injury caused to an employee of such [independent] contractor"); *N.J.S.A.* 46:2F–10(d)(4) (exempting, from Rule Against Perpetuities, transfers to "current or deferred benefit plan[s] for one or more employees, independent contractors, or their beneficiaries or spouses"); *N.J.S.A.* 54:32B–2(i)(1)(C) (defining, for purposes of Sales and Use Tax Act, *N.J.S.A.* 54:32B–1 to –43, "seller" as "[a] person who solicits business either by employees, independent contractors, agents or other representatives").

Indeed, a recent legislative enactment underscores the Legislature's recognition of the differences between employees and independent contractors and the steps the Legislature undertakes when it wishes to equate them. In the Construction Industry Independent Contractor Act, *L.* 2007, *c.* 114, § 4 (eff. July 13, 2007), the Legislature provided that "services performed in the making of improvements to real property by an individual for remuneration paid by an employer [as statutorily defined] shall be deemed to be employment unless and until it is shown" what an independent contractor status—as defined in the statute—exists. Illustrative of the importance the Legislature ascribes to the distinction between employees and independent contractors, that Act also provides for civil and criminal penalties if an employer misclassifies construction workers as independent contractors. *Id.* at §§ 5–7. Thus, the proposition that the Legislature is fully cognizant of how to—and entirely able to—treat "employees" and "independent contractors" as fungible terms admits of no serious dispute.

In contrast, the Legislature has acknowledged the difference between employees and independent contractors and, where it has discerned a need to do so, it has not hesitated to explicitly differentiate between them. *See, e.g., N.J.S.A.* 17B:32–89(a)(2) (exempting from immunity from liability granted to receivers and their employees under Life and Health Insurers Rehabilitation and Liquidation Act, *N.J.S.A.* 17B:32–31 to –91, those "retained by the receiver as independent contractors and their employees"); *N.J.S.A.* 34:1B–113 (providing, under Business Retention and Relocation Assistance Act, *N.J.S.A.* 34:1B–112 to –123, that " '[f]ull-time employee' shall not include any person who works as an independent contractor or on a consulting basis for the business"); *N.J.S.A.* 34:1B–125 (providing, under Business Employment Incentive Program Act, *N.J.S.A.* 34:1B–124 to –143, that " '[f]ull-time employee' shall not include any person who works as an independent contractor or on a consulting basis for the business"); *N.J.S.A.* 34:11–4.1(b) (defining, under Wage Payment Law, *N.J.S.A.* 34:11–2 to –33.6, "[e]mployee" as "any person suffered or permitted to work by an employer, except that independent contractors and subcontractors shall not be considered employees"); *N.J.S.A.* 40A:10–1(c) (providing that local governmental unit may purchase insurance for its negligence or that of those "authorized to perform any act or services, but not including an independent contractor"); *N.J.S.A.* 40A:10–6(c) (providing that local governmental unit may establish insurance fund for its negligence or that of those "authorized to perform any act or services, but not including an independent contractor"); *N.J.S.A.* 40A:14–38 (providing that fire district may purchase insurance for negligence of its fire volunteers "authorized to perform any act or service, but not including an independent contractor"); *N.J.S.A.* 42:1A–53(a)(5) (providing, under Uniform Partnership Act, *N.J.S.A.* 42:1A–1 to –56, that foreign limited liability partnership engaged in selling through independent contractors is not engaged in transacting business in New Jersey sufficient to trigger qualification requirements); *N.J.S.A.* 43:21–19(i)(7)(Z) (exempting from definition of "employment" under unemployment compensation

scheme "outside travel agent, who acts as an independent contractor"); *N.J.S.A.* 59:1–3 (specifically excluding, for purposes of Tort Claims Act, *N.J.S.A.* 59:1–1 to 59:12–3, independent contractor from defined term "employee").

Also, when it has deemed it appropriate, the Legislature has specifically defined the term "independent contractor" without regard to any concept of employment. *See N.J.S.A.* App. A:9–79, A9–80, A9–82, A9–83, A:9–84 (eff. Sept. 15, 2007) (comprehensively defining, for domestic security purposes, "[i]ndependent contractor" as "a person, firm, company or organization which enters into a contract to work within, supply or deliver materials to a designated facility [defined, by *N.J.S.A.* 13:1K–21, as a 'building, equipment, and contiguous area'] and whose employees have physical access to a designated facility").

In other instances and in a wide variety of contexts, the Legislature has used the term "independent contractor" without any particular definition, further acknowledging both its meaning separate and apart from, and its differences with, the term "employee." *See, e.g., N.J.S.A.* 2A:53A–7 (immunity from liability for negligence); *N.J.S.A.* 2C:20–11(a)(4) (definitions of shoplifting); *N.J.S.A.* 2C:21–6.1(a)(1) (definitions relative to scanning devices, etc.); *N.J.S.A.* 4:4–20.3(r) (definitions under Commercial Feed Law); *N.J.S.A.* 13:12–22 (retention of legal and administrative help by Morris Canal); *N.J.S.A.* 14A:13–15(b) (notice of business activities report by foreign business corporations); *N.J.S.A.* 17:47A–2 (definitions under Risk Retention Act, *N.J.S.A.* 17:47A–1 to –12); *N.J.S.A.* 17B:30B–12(i)(1) (fraudulent viatical settlements); *N.J.S.A.* 27:7–11 (maintenance of state highways); *N.J.S.A.* 27:7–21 (powers of commissioner to acquire, construct, and maintain state highways); *N.J.S.A.* 30:4–98(*l* ) (authorizing State Board of Human Services to act as independent contractor using "the labor of ... inmates ... within its jurisdiction"); *N.J.S.A.* 30:4D–17.1 (suspension or disqualification of Medicaid providers); *N.J.S.A.* 30:13–16 (review of Medicaid recipient by independent contractor); *N.J.S.A.* 32:8–3(g) (post-employment re-

striction on former members of Delaware River Joint Toll Bridge Commission extends to independent contractor status); *N.J.S.A.* 32:23–26 (forbidding unlicensed independent contractors from loading or unloading waterborne freight); *N.J.S.A.* 34:6–136.2(d) (defining, for purposes of Home Work Law, *N.J.S.A.* 34:6–120 to – 136.23, "employer" to "mean[ ] any person, including any independent contractor, who, directly or indirectly or through any employee, agent, independent contractor, subcontractor, or any other person" distributes, delivers, or sells "materials or articles manufactured within this State in a home"); *N.J.S.A.* 34:6–136.7(c) (barring independent contractors from permits under Home Work Law); *N.J.S.A.* 34:6–136.11 (requiring records of transactions with independent contractor); *N.J.S.A.* 39:2A–32 (requiring fingerprints and criminal history checks of independent contractors working on Motor Vehicle Commission premises); *N.J.S.A.* 39:4– 50 (immunizing independent contractors retained by court in driving while intoxicated matters); *N.J.S.A.* 42:1A–10(c)(3)(b) (rebutting partnership presumption of providing services as independent contractor); *N.J.S.A.* 45:7–65.3(a)(2) (prohibiting solicitation of mortuary services by independent contractors at eldercare facilities); *N.J.S.A.* 45:17A–20 (defining, for purposes of Charitable Registration and Investigation Act, *N.J.S.A.* 45:17A–18 to –40, "[c]ommercial co-venturer" to include independent contractor); *N.J.S.A.* 48:3–56(f)(1) (requiring board of public utilities to hire independent contractor to perform audits of electric public utilities); *N.J.S.A.* 48:3–58(k)(1) (requiring board of public utilities to hire independent contractor to perform audits of gas public utilities); *N.J.S.A.* 52:14B–4(f) and (g) (allowing director of Office of Administrative Law to assign independent contractor to conduct public hearing); *N.J.S.A.* 52:18A–214 (authorizing Departments of the Treasury and State to contract with independent contractors for restoration, repair, maintenance, and operation of Trenton War Memorial); *N.J.S.A.* 52:27EE–36 and –43 (exempting, under Public Advocate Restoration Act of 2005, *N.J.S.A.* 52:27EE–1 to –85, independent contractors providing mental health or developmentally disabled advocacy from Tort Claims Act immunity); *N.J.S.A.*

52:32–33(a) (defining, for purposes of New Jersey Prompt Payment Act, *N.J.S.A.* 52:32–32 to –39, "[b]usiness concern" to include "independent contractors[ ] providing goods or services directly to a using agency or to a designated third party and operating pursuant to a State contract").

The brute force of those disparate statutory provisions is clear: the Legislature can and repeatedly does set forth when it wishes its reach to cover independent contractors and when it does not.

In that context, CEPA is illustrative of how the Legislature acts when it does not wish to equate "independent contractors" with "employees." When the Legislature has chosen to eliminate any distinctions between "employees" and "independent contractors" it has displayed no reticence or difficulty in doing so. Yet, it cannot be disputed that CEPA protects employees and only employees. Against that backdrop, any extension of CEPA's reach is an unwarranted intrusion into the Legislature's realm.

In the end, the majority's interpretation of CEPA's definition of an "employee" stretches that definition to an unrecognizable—and ultimately meaningless—shape. Thus, as a matter of statutory construction, CEPA should be interpreted in a manner true to its legislative origins: as the Conscientious *Employee* Protection Act. Any further expansion of its reach properly belongs to the Legislature.

## II.

Even if one accepts the majority's interpretation of CEPA's reach,[3] D'Annunzio is emblematic of how the majority's construct

---

[3] If the designation "independent contractor" is nothing more than a sham designed to avoid the proper incidents of an employment relationship, then logic demands that a label should not foreclose further inquiry. That, however, is not the case here. As D'Annunzio was forced to admit, there was true substance to his independent contractor relationship with Prudential; otherwise, D'Annunzio's design to create a tax dodge by establishing his professional corporation, having that corporation contract with Prudential, and his service as an employee of that professional corporation would have been a fraud. In those circum-

goes badly astray. In this case, D'Annunzio, for his own purposes, negotiated with Prudential to provide certain services in exchange for a contractually agreed on hourly rate; he created a professional corporation to enter into that contract with Prudential; and he in fact entered into a written contract with Prudential. Section II of that contract, titled "Legal Relationship between the Medical Director and Prudential," plainly states as follows:

> *The relationship between Prudential and [D'Annunzio] is that of independent contractor.* The Medical Director will maintain his own private practice and provide Medical Director services on a part time basis. Prudential makes no representations as to the volume of referrals and [D'Annunzio] acknowledges [that] this agreement is not exclusive. *None of the provisions of this agreement are intended to create or be construed as creating any* agency, partnership, joint venture or *employer-employee relationship.*
>
> As an independent contractor, [D'Annunzio] will have the sole responsibility for the payment of all self employment and applicable federal[,] state and local taxes. [Emphasis supplied.]

Despite that clear language, D'Annunzio now claims that, because he was provided stationery on which to write, because he was told the format in which reports were to be prepared, and because he was asked to do what he contracted in writing to do— that Prudential would provide him "adequate working space and necessary resources" and that he would "maintain office hours at the Prudential PIP claims office[,] Monmouth Executive Center, 3 Paragon Way Bldg. 3[,] Freehold, NJ 07728 from 8 am until 12 pm (Monday through Friday)"—and even though his contract with Prudential required that he maintain a separate, viable private practice, somehow Prudential exercised sufficient "control and direction" over him to invoke CEPA's protections. That claim is legal gibberish.

The contract between D'Annunzio and Prudential could not have been clearer. D'Annunzio contracted to perform professional services on a part-time basis for Prudential. For his own econom-

---

stances, the judicial inquiry should respect the parties' bargain, and should not engage in metaphysical determinations of the minutiae of just how independent the contractor was.

ic purposes, D'Annunzio insisted on Prudential contracting for his services through his professional corporation. By his own design, then, D'Annunzio was an employee of his own professional corporation, while his professional corporation was an independent contractor to Prudential. That contract made clear that the relationship between the parties was one of an independent contractor (D'Annunzio, through his professional corporation) providing services to Prudential. Yet, when it suits his purpose in seeking to invoke CEPA's protections, D'Annunzio readily renounces all that he bargained for in exchange for a chance at a recovery under CEPA.

CEPA represents all of the salutary goals and aspirations the majority eloquently describes. It is, as the majority notes, "remedial social legislation designed to promote two complimentary public purposes: to protect and [thereby] encourage employees to report illegal or unethical workplace activities[,] and to discourage public and private sector employers from engaging in such conduct." *Ante,* at 119, 927 *A.*2d at 118 (citations and internal quotation marks omitted). However, when we pervert its intendment solely to extend its reach to one who proudly wears the mantle of an independent contractor when it is convenient to him—only to shed it for the greener pastures of a hoped-for litigation recovery—we devalue CEPA's worth and cheapen its meaning. Prudential negotiated its contract with D'Annunzio in good faith, and Prudential abided by all of the contract's terms, including its termination on notice provisions. In those circumstances, D'Annunzio should be required to abide by the terms of the contract—the basis of the bargain—he knowingly, intelligently, and intentionally negotiated, not rewarded with a breath of renewed life to this rightly defunct claim.

## III.

For the foregoing reasons, I would reverse the judgment of the Appellate Division and reinstate the judgment of the trial court

that dismissed D'Annunzio's complaint. Therefore, I respectfully dissent.

*For Affirmance as Modified/Remandment*—Chief Justice ZAZZALI, and Justices LONG, LaVECCHIA, ALBIN and WALLACE—5.

*For reversal*—Justice RIVERA–SOTO—1.