**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0225-17T2

JULIO PENDOLA,

     Petitioner-Appellant,

v.

MILENIO EXPRESS, INC.,
d/b/a CLASSIC,

     Respondent-Respondent.

_____

Argued June 26, 2018 - Decided October 26, 2018

Before Judges Nugent and Accurso.

On appeal from the Department of Labor and Workforce Development, Division of Workers' Compensation, Claim Petition No. 2014-31102.

Pablo N. Blanco argued the cause for appellant (The Blanco Law Firm, LLC, attorneys; Pablo N. Blanco, on the brief).

Robert M. Gilbert argued the cause for respondent (Law Offices of Styliades and Jackson, attorneys; Robert M. Gilbert, on the brief).

PER CURIAM

The Division of Workers' Compensation dismissed Julio Pendola's claim petition for compensation benefits against Milenio Express, Inc. d/b/a Classic, on the basis that Pendola was not Classic's employee. Pendola appeals, claiming he established an employment relationship because his work was an integral part of Classic's business and controlled by the company. We agree and reverse.

Pendola, an auto cab driver in Newark, fractured his ankle in 2014 picking up a customer. The facts of Pendola's accident and injury are not at issue in this appeal.[1] The parties agreed to bifurcate the trial, with the court first addressing whether Pendola was an employee of Classic or an independent contractor. Only two witnesses testified, Pendola and Veronica Solano, a Classic supervisor.

Pendola testified he had worked exclusively as a driver for Classic since 2003, at first driving someone else's car. When he purchased his own car, a Crown Victoria, he consulted with Classic. Classic required that he paint the car silver, the color assigned the company by the City, and affix the Classic logo to the sides and front of the car, along with the company's telephone number. The company also required that he purchase a two-way radio to be installed in the car. Pendola testified he paid for all of those expenses as well as for his

_____

[1]  We note, however, that the injury was a serious one, requiring surgery. Pendola had no other insurance and medical bills of over $63,000, some of which were paid by charity care.

A-0225-17T2

medallion, gas, maintenance on his car and liability insurance. The company told him where to pick up customers and supplied him with business cards, receipts and vouchers, "whatever we needed to work," all bearing the Classic logo.

Pendola explained he was not permitted to pick up passengers off the street as a taxi driver would. The only passengers he was permitted to pick up were those dispatched through Classic. He testified he paid Classic $150 a week and was permitted to keep all of his fares. He estimated he grossed between $500 and $700 a week. He could work whatever hours he chose. Pendola testified that Classic had rules for drivers, which they enforced. Asked what kind of rules, he said, "Like you had to get well dressed. Keep the car clean. Be polite with the people . . . [and] [b]e on time on the pick ups." If a driver failed to follow the rules, he would be suspended. Pendola said he was suspended a couple of times for picking up another driver's fare or being late for pick-ups. He testified that on those occasions he was suspended for a few hours or the rest of the day. He also claimed Classic stopped letting some drivers work after "they got nasty."

Pendola testified Classic was owned by six people and the company had

over 100 cars. Driving for Classic was Pendola's only job and it represented his only source of income for his entire tenure.

Solano testified that Classic, although owned by one individual, her cousin, was "more of like a family business." "The people that supervise are family members" and "[m]ost of the family members also have vehicles working with the company." Solano testified that although she did not drive, her husband did, and they had "two more drivers" who rent the cars and pay the couple a weekly fee.

Solano testified that Classic is a "dispatching service." The drivers are "called independent owners/operators" who have their own cars, their own medallions and Classic charges them "a weekly dispatching fee for the service." Asked about the company's requirement that the drivers paint their cars silver and carry the Classic name and phone number, Solano explained that the "[t]he City of Newark Taxi Division requires that each company have a color" and that Classic had been assigned "the silver color for many years." "So if they're going to work with our transportation company they have to have our color; they have to have our logos." Solano further explained that the drivers also "have to have the Newark license in the back in case there's an accident . . . then the other

person can actually see what company it is, what the auto cab license number is."

Solano testified that Classic is not a taxi service but an auto cab company and that its customers have to "call our office . . . for the ride." She explained that at the time of Pendola's accident, Classic "had two different [radio] channels at [its] office besides the phone operators."[2] When a driver

> would want to start to work[,] he would turn on the radio and he would listen to the dispatcher calling out the jobs and if he was close to one of those jobs he would what we say "punch for the ride" or "request the ride."

> He would press his microphone. The number would come up at the office so we would know that he was requesting that job. He would be put in a list along with the other people that are requesting the ride, and then the dispatcher will assign the ride according to who was next on the list, who was waiting longer for the next ride.

Solano explained that Classic does not "force [the drivers] to go and pick up a certain fare. That's up to them. They're their own boss." She also testified that "[t]he rules that [the drivers] have to follow . . . are pretty much the ones that we enforce according to what [the] Taxi Division requests." Although

---

[2] Since the accident, Classic has abandoned two-way radios and now dispatches drivers via computer tablets the drivers purchase themselves.

testifying that Classic enforced the rules in order to "try to help [the drivers] out" by avoiding tickets issued by the Taxi Division, she conceded "[o]f course, we want our customers to have nice vehicles, clean vehicles, proper attired drivers, you know." Solano testified if a driver violated the rules, Classic "put them out for [two] hours." She provided an example of a customer calling and telling her "[t]he vehicle that I'm riding in right now is extremely dirty and has a hole in the floor." Solano said "[s]o I called the driver and I said: A customer is telling me that you have this and that. You need to come here so we can look at the vehicle, and you are going to be out until you do so. You have [two] hours."

When asked whether Classic routinely inspected the drivers' cars, Solano responded: "We have — we don't really do it but we have certain people that check the vehicles and if they see that there's something they will call us and they'll tell us: That person needs to go to a car wash. The car is dirty." She testified that Classic did not furnish any equipment for the drivers but provided them with Classic "business cards, receipts, vouchers for credit cards that they would need" and sometimes purchased key chains and pens for them "to give to the customers." Solano also explained the company advertised its transportation service via a website and has "an app for our customers . . . to request service."

A-0225-17T2

She testified that Classic has no written agreements with the drivers and "[t]hey don't receive a 1099 or anything from us. They're not our employees." She did, however, concede that Classic drivers were not free to pick up fares in a silver Classic car dispatched through another company, explaining "[t]hey're auto cabs and that's how it works."

Applying the twelve-factor Pukowsky[3] test, the framework the Court adopted "for assessing a worker's employment status in the context of social legislation" in D'Annunzio v. Prudential Insurance Co. of America, 192 N.J. 110, 122-24 (2007), and "endorse[d] for purposes of determining whether the Compensation Act applies" in Estate of Kotsovska ex rel. Kotsovska v.

---

[3] Pukowsky v. Caruso, 312 N.J. Super. 171, 182-83 (App. Div. 1998). The twelve factors are as follows:

> (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation-supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer[";] (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.
>
> [Ibid. (citation omitted).]

A-0225-17T2

Liebman, 221 N.J. 568, 576, 595 (2015), the compensation judge concluded Pendola was not an employee of Classic. The judge found Classic "exercised very little control over the means and manner of [Pendola's] performance." He noted that although Pendola was required by the "Taxi Division to paint his vehicle silver and to place the name 'Classic'" and the company's phone number on it, "he was otherwise left on his own to drive and pick up fares and unaccountable to Milenio/Classic." The judge noted Pendola set his own schedule and was free to accept or reject the fares dispatched to him by Classic.

The judge also found Classic did not supervise Pendola, that he was required to have an auto cab license and comply with the rules of the Taxi Division, that he furnished his own car and that, although he had been "associated with" Classic for eleven years, it was "only to the extent of being a driver of an auto cab which was dispatched by Milenio/Classic." The judge further found Pendola received no salary from Classic but was required to pay a dispatching fee of $150 per week. As to factor seven, the manner of termination of the relationship, the judge found that Pendola "would only be prohibited from operating an auto cab by the Taxi Division for failing to comply with the Taxi Division rules and regulations, which would result in the revocation of his auto cab license by the Taxi Division." The judge found there was no annual leave.

A-0225-17T2

As to factor nine, whether Pendola's work was an integral part of Classic's business, the judge found Classic's business was "dispatching [Pendola] and drivers of auto cabs." He found Classic was not dependent on Pendola, reasoning that were he "not available to transport a fare, another cab driver was waiting to do so. No one driver was essential to the effective functioning of the business."

The judge further found that Pendola did not accrue retirement benefits and Classic did not pay social security taxes. As to the final factor, the judge found "based upon the arrangement" between the parties, "it is clear there was no intention that petitioner was to be an employee of Milenio/Classic."

Pendola appeals, arguing the compensation court underestimated the degree of control Classic exercised over its drivers relevant to factor one of the Pukowsky test and misconstrued critical factor nine, representing the "relative nature of the work test," which measures "the extent of the economic dependence of the worker upon the business he serves and the relationship of the nature of his work to the operation of that business." Marcus v. E. Agric. Ass'n, Inc., 58 N.J. Super. 584, 603 (App. Div. 1959) (Conford, J.A.D., dissenting), rev'd on dissent, 32 N.J. 460 (1960). We agree.

Because the question before us involves an interpretation of law and the legal consequences of established facts, our review is de novo. Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995). The Supreme Court has reiterated on numerous occasions that our State's comprehensive statutory scheme of workers' compensation coverage "for the compensation of injured workers 'is remedial social legislation and should be given liberal construction in order that its beneficent purposes may be accomplished.'" Cruz v. Cent. Jersey Landscaping, Inc., 195 N.J. 33, 42 (2008) (quoting Torres v. Trenton Times Newspaper, 64 N.J. 458, 461 (1974)).

As the Court held in D'Annunzio, and reiterated in Kotsovska, "when 'social legislation must be applied in the setting of a professional person or an individual otherwise providing specialized services allegedly as an independent contractor,' the trial court should consider three factors: '(1) employer control; (2) the worker's economic dependence on the work relationship; and (3) the degree to which there has been a functional integration of the employer's business with that of the person doing the work at issue.'" Kotsovska, 221 N.J. at 594 (quoting D'Annunzio, 192 N.J. at 122); see also Hargrove v. Sleepy's, LLC, 220 N.J. 289, 310 (2015) (emphasizing those three of the twelve Pukowsky factors as most pertinent when applying socially remedial legislation).

Here, of course, there was no dispute regarding Pendola's economic dependence on Classic. Pendola had been driving for Classic for eleven years, and it was his sole source of income. Although one could debate whether the requirement that Pendola paint his car silver and display prominently the Classic name and phone number was indicia of control by Classic or merely enforcement of Newark auto cab regulations, other aspects of the relationship point unequivocally to a significant level of control by Classic over its drivers.

Besides requiring its drivers install a two-way radio in the cars, at their expense, the drivers were subject to Classic's rules as to which drivers would receive a dispatched fare. Drivers were not free to pick up any nearby passenger calling Classic for a ride. They were required, pursuant to rules established by Classic, to request the ride from the dispatcher, who would decide which driver would pick up the passenger based on how long the driver had waited since his last fare. Further, as explained by Classic supervisor Solano, when customers complained about the condition of a car, a supervisor would immediately contact the driver and tell him, "[y]ou need to come here so we can look at the vehicle, and you are going to be out until you do so. You have [two] hours." The testimony demonstrated not only that Classic maintained rules for its drivers, but that it enforced them.

Even more important, however, we conclude the judge of compensation misapplied factor nine, "whether the work is an integral part of the business of the 'employer.'" Pukowsky, 312 N.J. Super. at 183. As Justice LaVecchia explained in D'Annunzio, that factor "allows for examination of the extent to which there has been a functional integration of the employer's business with that of the person doing the work." 192 N.J. at 123.

> Several questions elicit the type of facts that would demonstrate a functional integration: Has the worker become one of the "cogs" in the employer's enterprise? Is the work continuous and directly required for the employer's business to be carried out, as opposed to intermittent and peripheral? Is the professional routinely or regularly at the disposal of the employer to perform a portion of the employer's work, as opposed to being available to the public for professional services on his or her own terms? Do the "professional" services include a duty to perform routine or administrative activities? If so, an employer-employee relationship more likely has been established.
>
> [Id. at 123-24.]

Asking those questions here, in our view, makes plain the functional integration of Pendola's work into Classic's business. It cannot be seriously disputed that Pendola was one of the "cogs" in Classic's operation. His work as a driver willing to provide the rides Classic arranged was essential to the success of its business. The work of the drivers was certainly continuous, Classic

operated twenty-four hours a day, and thus needed many drivers day and night to carry out its operations. Drivers such as Pendola could not use their own silver Classic car to pick up fares dispatched from competitors of Classic or those attempting to call them directly. The drivers were thus prohibited from using their own cars to further any business but Classic's. And although a driver's passengers or hours might vary, the daily routine of picking up Classic's customers and delivering them to their destinations throughout Newark did not change.

We agree with Pendola that the judge of compensation's finding that Classic's business was limited "solely [to] dispatching [Pendola] and drivers of auto cabs" is not supported by the evidence. Although Solano began her testimony by asserting that Classic was only "a dispatching service," she also referred to it as a "transportation company" and the riders as Classic's customers, who Classic wooed with web ads, apps, keychains and pens with the company's name and "nice vehicles, clean vehicles" and punctual, "proper attired drivers." We also agree with Pendola that the judge of compensation erred in finding that Classic was not dependent on Pendola because if he "was not available to transport a fare, another auto cab driver was waiting to do so." The compensation judge's finding that "[n]o one driver was essential to the effective

13

functioning of the business" misapprehends the test. The point, of course, is that Classic was dependent on Pendola and other drivers like him. That the business required multiple drivers to operate does not reduce Pendola's importance to Classic's business or make him any less a "cog" in Classic's enterprise. D'Annunzio, 192 N.J. at 123. Accordingly, we conclude that application of the Pukowsky test establishes Pendola as an employee of Classic under our workers' compensation laws.

We are not the first panel of this court to conclude that Classic's drivers are its employees and not independent contractors. In 1999, another panel considering the same question concluded that "according to the criteria of the 'relative nature of the work' test, each of Classic's taxicab [sic] drivers was an integral part of its total operation and that they were therefore 'employees' for purposes of workers' compensation." Santos v. Classic Sedan Limo, Inc., A-5356-97 (App. Div. July 2, 1999) (slip op. at 8), certif. denied, 163 N.J. 12 (2000).

The petitioner in Santos was shot by a passenger dispatched by Classic. Santos, slip op. at 1. Santos owned his own cab, which was painted the company's silver color and had "Classic Sedan Limo" and the company's telephone number displayed on its doors, like all the cabs dispatched by Classic,

14

in order "to convey the impression that they were a fleet of taxis operated by a single company." Id. at 2. We explained how the service worked as follows:

> Classic placed a listing for taxi services in the telephone yellow pages, and perhaps elsewhere, advertising the availability of its taxis. Classic maintained a dispatcher who received customers' calls for taxis and undertook to broadcast each call to whomever of its nearby drivers had been waiting the longest since his last fare. To receive these calls, each driver was required to purchase a prescribed radio from Classic. Classic's drivers were permitted to accept only passengers assigned to them by the dispatcher.
>
> [Ibid.]

We noted the company maintained an extensive set of rules, which it enforced by "suspending" drivers who violated them. Id. at 3. We explained that "[t]he dispatcher would not assign waiting passengers to a suspended driver, thus effectively docking his pay during the period of his suspension." Ibid. We noted Santos owned and paid for his own cab, keeping the fares he collected and paying for "gasoline, repairs, insurance, and a fee of $150 a week to Classic," making him "financially dependent on his affiliation" with the company. Id. at 3-4.

We found Santos' relationship with Classic satisfied both the "right to control" test as well as the "relative nature of the work" test, finding "Classic possessed and exercised the power to control Santos in his performance of his

15

work," and that he was "economically dependent on Classic." Id. at 5-6. We specifically rejected the judge of compensation's finding "that Classic is 'in the business of soliciting fares for the owners of the cabs,'" noting the judge also observed "that Classic was 'holding [itself] out to the public as . . . a safe[,] reliable source of transportation' and that it was important for the drivers to maintain uniform standards and discipline to assure that the 'overall operation functioned.'" Id. at 8. We found those "observations show that Classic was in the business of providing transportation, not merely dispatching. There would be no customers to dispatch in return for the owner-drivers' weekly payments if steps were not taken to assure that the total enterprise provided satisfactory service to the public." Ibid. We thus concluded "that according to the criteria of the 'relative nature of the work' test, each of Classic's taxicab drivers was an integral part of its total operation and that they were therefore 'employees' for purposes of workers' compensation," thereby reversing the contrary finding of the compensation judge. Id. at 8-9.

In its brief and at oral argument, Classic made no attempt to explain why our prior opinion is no longer binding on the company. See Raymond v. N.J. State Parole Bd., 221 N.J. Super. 381, 384 n.1 (App. Div. 1987) (noting that "[w]hile an unpublished opinion does not have stare decisis effect, it is

nevertheless binding as against a party . . . whose conduct is thereby prescribed." (citing R. 1:36-3)). Its only response is the one relied on in its brief that "it should be noted that [Santos] was a 1999 decision and things have changed considerably in the taxicab business since the rendering of that decision." Perhaps so, but it is nevertheless apparent that at the time of Pendola's accident at least, the relationship between Classic and its drivers remained remarkably constant.

Reversed and remanded for further proceedings not inconsistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0225-17T2