**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0592-24

NISHA SANGER,

    Plaintiff-Appellant,

v.

NEXT LEVEL BUSINESS
SERVICES, INC., COGNIZANT
TECHNOLOGY SOLUTIONS
COMPANY, NN SRINIVAS,
AARTI CHOPRA, SHRUTI
SINGH, and NIKHIL ANAND,

    Defendants-Respondents,

and

AYAN SAHA,

    Defendant.

_____

Argued March 2, 2026 – Decided March 26, 2026

Before Judges Sabatino, Walcott-Henderson and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-1274-20.

Michael K. Fortunato argued the cause for appellant (Brandon J. Broderick, LLC, attorneys; Michael K. Fortunato, of counsel and on the briefs).

D. Lewis Clark Jr. (Squire Patton Boggs (US) LLP) of the Arizona bar, admitted pro hac vice, argued the cause for respondents Next Level Business Services, Inc., Nikhil Anand, and Shruti Singh (Squire Patton Boggs (US) LLP, attorneys; Mark C. Errico, D. Lewis Clark Jr., and Melissa Legault (Squire Patton Boggs (US) LLP) of the Arizona bar, admitted pro hac vice, of counsel and on the briefs).

Ivan R. Novich argued the cause for respondents Cognizant Technology Solutions Company, NN Srinivas, and Aarti Chopra (Littler Mendelson, PC, attorneys; Ivan R. Novich and Rachel Simone Frey, on the briefs).

PER CURIAM

In this employment discrimination case, plaintiff Nisha Sanger appeals from a July 19, 2024 order granting summary judgment in favor of defendants Next Level Business Services, Inc. ("NLB"), Cognizant Technology Solutions Company ("Cognizant"), and individually-named employees of both entities.[1] Plaintiff's complaint alleged sexual harassment and race and gender discrimination based on conduct exhibited by defendants' employees. The court,

---

[1] On September 30, the court also granted plaintiff's motion for summary judgment dismissing defendant Chopra's counterclaims for emotional distress against plaintiff, which is not before us.

2

A-0592-24

however, found plaintiff was an independent contractor and not an employee of defendants Cognizant or NLB, and thus could not substantiate her discrimination claims under the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 to -50. The court also subsequently denied reconsideration. For the reasons that follow, we affirm both orders.

I.

We glean the relevant facts from the parties' briefs and Rule 4:46-2 statements submitted to the motion court, viewing the evidence in the light most favorable to plaintiff as the non-movant. Harz v. Borough of Spring Lake, 234 N.J. 317, 329 (2018).

Plaintiff is an experienced recruiter of technology professionals who matches qualified applicants to various positions in technology companies. According to plaintiff, she handles the entire recruitment process, identifying candidates through placement, including "calling candidates, matching them with job opportunities, and handling all aspects of the recruitment process." At all times relevant to this matter, plaintiff also owned her own company, Mirosoft, which she started in 2018 to provide recruiting services to technology companies.

A-0592-24

According to plaintiff, in 2019, an employee of Cognizant—an information technology services and consulting company—who was familiar with her work contacted her to inquire whether she would be interested in a position with the company.[2]

At all times relevant to this appeal, NLB, also an information technology consulting and staffing solutions company, provided recruitment services to Cognizant. Plaintiff's point of contact at NLB was Shruti Singh, its Manager of Client Relations, who was based in India and reported to Nikhil Anand, NLB's Senior Vice-President of Operations.

The record reflects that plaintiff was interviewed by a member of Cognizant's recruiting team in early 2019. On February 6, 2019, NLB and Mirosoft executed an agreement ("Agency Agreement") pursuant to which Mirosoft agreed to provide recruiting services to NLB. As set forth in the provision entitled "Engagement and Duties," the agreement states that "upon the terms and subject to the conditions of this Agreement, NLB [] hereby engages Agency to provide Consultants to NLB [] to assist in the creation of [all work product]."

---

[2] The parties do not agree on whether plaintiff applied for a position at Cognizant and NLB or was recruited by them.

A-0592-24

The Agency Agreement further sets forth key terms addressing the required services, payment, and classification of Mirosoft-supplied personnel as independent contractors, not employees. Section seven of the Agency Agreement is instructive on this point and provided in relevant part:

> 7. Independent Contractor.
>
> Personnel supplied by [a]gency [(Mirosoft)] are deemed be employees or contractors of [a]gency and will to not, for any purpose, be considered employees, subcontractors or agents of NLB []. Agency will be solely responsible for complying with all tax and employee protection laws. Agency assumes full responsibility for the actions of its employees while performing services. Agency will be responsible for the payment to its employees of salary, including withholding of income taxes, Social Security, Workers Compensations, Disability Benefits, and the like.

The Agreement further provided that either party could terminate the agreement by providing two weeks' written notice or that NLB could terminate immediately without notice if "any contract under which [Mirosoft] is providing [c]onsultants to NLB . . . is terminated or reduced in scope for any reason."

The agreement also provided that any future work performed by Mirosoft would be governed by purchase orders specifying the scope of the services to be performed and required Mirosoft to submit "client approved time sheets" for the services rendered. The Agreement likewise provided that Mirosoft would not

5

claim payment for more than forty hours of work per week and that compensation for those services would be paid by NLB to Mirosoft, rather than to plaintiff individually.

Other written agreements followed, including a purchase order specifying the terms of payment between Mirosoft and NLB. One such purchase order, dated February 6, 2019, stated plaintiff would be assigned to work for Cognizant at a "Consulting Rate" of fifty-five dollars per hour for a "[p]roject duration" of twelve months "with possible extensions," and included terms regarding payment. In particular, the purchase order provided that Mirosoft would be required to submit monthly approved timesheets to Cognizant, after which Cognizant would pay NLB for the services, and NLB would then issue payment to Mirosoft.

Plaintiff and Cognizant entered into a separate, undated agreement ("Consultant Agreement"), which required plaintiff to "provide certain consulting, technology related services, and/or other work" as detailed in the purchase order. The Consultant Agreement further provided that plaintiff would "not receive, or be eligible to receive, any compensation directly from Cognizant." As to plaintiff's employment status, the Consultant Agreement stated, in relevant part:

6

1. Engagement.

Cognizant, in accordance with the terms of the Agency Agreement . . . , dated February 15, 2008 by and between Cognizant and [NLB] Consultant as an independent contractor to provide certain consulting, technology related services, and/or other work more specifically identified in a purchase order executed by Cognizant and Agency . . . .

. . . .

7. Independent Contractor.

Consistent with [c]onsultant's independent contractor status, [c]onsultant acknowledges and agrees that: (i) it is an independent contractor of Cognizant; (ii) nothing is this [a]greement is intended to or will be construed to create an . . . employment relationship between Cognizant and [c]onsultant; . . . (v) [c]onsultant shall not represent directly or indirectly that [c]onsultant is an employee of Cognizant; (v) [c]onsultant is an employee solely of [a]gency or [a]gency's subcontractor and will not be considered an employee of Cognizant for any purpose including (1) payment of salary, benefits, or other compensation, (2) federal, state or local tax, employment, withholding or reporting purposes, or (3) eligibility or entitlement to any benefit under any of Cognizant's employee benefit plans . . . ; (vii) Cognizant shall have no responsibility for any employer-related functions of Consultant, including supervising, disciplining, discharging, reviewing, evaluating, and setting the pay rates of Consultant; . . . .

Plaintiff could not participate in Cognizant's benefit plans, and Cognizant had "no responsibility for any employer-related functions . . . including

7

A-0592-24

supervising, disciplining, discharging, reviewing, evaluating, and setting the pay rates" for plaintiff's work. This Consultant Agreement also provided that with written notice, Cognizant could, "without liability, terminate or reduce the scope of this Consultant Agreement or any [p]urchase [o]rder under which Consultant is providing Services at any time effective immediately." The Consultant Agreement in the record before us bears only plaintiff's signature, not the signature of Cognizant's representative.

Additionally, the Consultant Agreement provided that plaintiff acknowledged receiving, reading, and understanding Cognizant's Core Values and Standards of Business Conduct, which were incorporated into the agreement by reference. The Core Values document stated, in relevant part, that it was important for the company to avoid conflicts of interest and that Cognizant's "associates" "must not hold a substantial financial interest in a customer, supplier, or competitor."

None of the agreements among plaintiff, Mirosoft, NLB, and Cognizant contained an exclusivity clause prohibiting plaintiff from providing recruiting services to other companies.

Plaintiff's work commenced in February 2019 under Chopra's supervision where she was included in a team of between ten and fourteen recruiters, some

of whom were Cognizant employees and others were designated as "contractors." After initially working from home for the first week, plaintiff stated that she worked in Cognizant's office twice per week with the remainder of the time spent working from home; while in the office, she worked from any available cubicle or conference room. She was given a badge, key card access to the office, cell phone, and email address.

Within approximately two months of plaintiff's hiring, her husband formed a separate recruiting company, which eventually contracted with Cognizant as arranged by plaintiff. Plaintiff worked at Cognizant from February to November 7, 2019, when Chopra informed her that Cognizant had terminated her contract.

Plaintiff's Complaint

On October 30, 2020, plaintiff filed a complaint against defendants, alleging various counts of employment discrimination under the LAD. More particularly, plaintiff alleged that during a meeting, the head of recruitment at Cognizant "inappropriately touched [her] by rubbing his legs against hers." Plaintiff further alleged that after the leg touching incident, she received a call from the senior vice president of operations at NLB responsible for maintaining

9

NLB's client relationship with Cognizant, who "propositioned [her] to engage in sexual relations with . . . [the head of recruitment]."

Plaintiff claims the senior vice president "instructed [her] to escort . . . [the head of recruitment] to a hotel room and advised that he . . . would pay for the room with his personal credit card to keep the arrangements secretive." Plaintiff claimed she told the senior vice president "that she needed time to think and would get back to him." A few days later, plaintiff claimed she received a call from Singh, who asked her if she had considered [the senior vice president's] offer and that "[i]f you refuse, it's not going to end well for you." Plaintiff alleged that approximately one week after that phone call, Cognizant terminated her contract.

Summary of the Parties' Deposition Testimony and Key Witnesses

Following the filing of plaintiff's complaint, a period of discovery ensued, during which plaintiff, the individually-named defendants, and witnesses were deposed. We first summarize key aspects of the deposition testimony relative to the threshold issue regarding plaintiff's status as an independent contractor or employee of Cognizant and NLB.

On this issue, plaintiff testified that she understood the arrangement among herself, Cognizant, and NLB to be that she would be an independent

10

contractor. The following transcribed remarks are questions posed by Cognizant's counsel and plaintiff's responses:

> Q. Okay. And did you understand . . . whether you were being offered a contract or to come on as an employee?
>
> . . . .
>
> A. As a contractor.
>
> Q. A contractor.
>
> A. Yeah.
>
> Q. Okay. Did you understand that from . . . the start of the interview process?
>
> A. Yes.

Later in the deposition, plaintiff reiterated her understanding of the arrangement with NLB and Cognizant:

> Q. Okay. And did you understand that you were an independent contractor?
>
> A. Yes.
>
> Q. Okay. And what did you understand that to mean?
>
> A. Well, in layman language, you know, my understanding was that, you know, because Cognizant is not hiring me directly and they have a vendor, so I will be paid by NLB, but I will be working for Cognizant.

11

A-0592-24

Regarding her role at Cognizant, plaintiff testified that Chopra would send her a list of open positions to be filled. Plaintiff would then review resumes received from various staffing agencies and, if a candidate appeared qualified, she would schedule the candidate for a screening interview. If the candidate passed the screening, she would then set up various interviews with Cognizant's technical teams. If the candidates received positive feedback from the interviews, they would receive an offer from Cognizant.

According to plaintiff, Cognizant worked with "thousands" of staffing agencies that provided candidates. NLB was one of Cognizant's "preferred" vendors for recruiting services. If NLB successfully placed a candidate, Cognizant would then pay NLB a placement fee separate from the payment Cognizant made to NLB for plaintiff's services.[3] However, if plaintiff sourced a candidate from another staffing agency, NLB would split its placement fee with the third-party agency, as was the case with payments made to plaintiff's husband's company.

Plaintiff also testified that she "was not allowed to punch in more than eight hours a day" regardless of whether she worked additional hours. She did

---

[3] The parties reference a separate agreement between Cognizant and NLB, outlining placement fees, which is not part of the record before us.

A-0592-24

not have a specific start or end time because, as she explained, "the expectation was that you finish your deliverables, [Chopra] should not get any escalation calls and everyone lives happily ever after."  And, she also understood that, as a contractor, she would not get paid for any days she took off.

Regarding plaintiff's hiring of her husband's company, she testified that in or around March or April of 2019, she had a conversation with Chopra about another staffing agency that Cognizant was working with, which Chopra had expressed dissatisfaction with because of their higher placement fees. According to plaintiff, she asked Chopra if they "could try to . . . leverage [her] husband in opening . . . a company" that would provide resumes for Cognizant. Plaintiff claims Chopra supported the idea, so long as Cognizant could "stop paying" the high placement fees to the other company.[4]  Plaintiff admitted that in April 2019, her husband formed Staffing Idea Factory ("Staffing Idea") to provide "recruitment outsourcing" work and that she used her husband's newly formed company to perform services for Cognizant.  She also confirmed that Staffing Idea had no other clients.

---

[4]  At her deposition, Chopra was not asked about her knowledge of plaintiff's husband's company.

A-0592-24

Chopra testified that she primarily oversaw recruiting for two business units, which involved recruiting "technical people" such as software engineers. Regarding plaintiff's position, Chopra testified that there was no requirement to come into the office on certain days, but that "if most of the people in the team decided to come on, like, two days, then, . . . everybody would follow that." Chopra further testified that plaintiff had a significant degree of control over performing her recruiting duties and was not subject to day-to-day supervision regarding how candidates were sourced or screened.

Singh testified that plaintiff introduced NLB to her husband's company, which resulted in NLB paying "heavy referral fees." According to Singh, she conducted an Internet search for the company name, but "did not see any digital presence." She did, however, discover that the company's address was the same as plaintiff's home address and its registered agent shared plaintiff's last name. Singh further testified that she then spoke with the senior vice president of operations and NLB's CEO, who asked her to send an email detailing the information she uncovered, which she did on November 6, 2019, attaching the results of her Internet search. Later that day, NLB's CEO forwarded Singh's email to Cognizant's head of recruiting for digital business, who decided to terminate plaintiff.

14

At his deposition, the head of recruiting testified that he took issue with plaintiff sourcing candidates through her husband's company, which she had failed to disclose because he believed the relationship gave her an "unfair advantage" in recruiting due to her knowledge of Cognizant's internal staffing needs. He also testified that plaintiff's failure to disclose her marital relationship raised concerns about a possible alleged conflict of interest with Cognizant's policies. Based on these concerns, the head of recruitment decided plaintiff should no longer perform recruiting services for Cognizant.

Defendants' Motion for Summary Judgment

Defendants moved for summary judgment, arguing that plaintiff was an independent contractor rather than an employee and, therefore, was not covered by the LAD. Defendants further contended that, even if the statute applied, plaintiff could not establish a prima facie case of sexual harassment, discrimination, or retaliation because the record contained no evidence of severe or pervasive conduct or any protected activity. Defendants also maintained that plaintiff's contract was terminated for legitimate, non-discriminatory reasons after Cognizant learned she failed to disclose that her husband owned a company. Plaintiff opposed the motion and cross-moved for summary

15

A-0592-24

judgment, arguing that she functioned as an employee and that genuine issues of material fact precluded dismissal of her LAD claims

The motion court issued an oral decision granting summary judgment in favor of defendants and dismissing plaintiff's complaint in its entirety. The court addressed the threshold issue of whether plaintiff was an employee or an independent contractor, correctly stating that plaintiff could only proceed with her LAD claims if she was an employee of Cognizant or NLB. The court denied plaintiff's cross-motion for summary judgment, concluding that the material facts were not in dispute, and that plaintiff functioned as an independent contractor.

The court analyzed the twelve-factor test set forth in Pukowsky v. Caruso, 312 N.J. Super. 171 (App. Div. 1998), beginning with the parties' intent (factor twelve), and relied on plaintiff's deposition testimony acknowledging she understood her independent contractor status, the complaint's allegation that she anticipated becoming a Cognizant employee in the future, and the parties' agreements, which were nonexclusive and expressly designated her as an independent contractor.

The court next assessed the method of payment (factor six) and noted that NLB paid plaintiff through Mirosoft, that she did not work on NLB's premises,

and that NLB did not provide her with any equipment to perform her duties, unlike Cognizant, which supplied her with a laptop and cell phone (factor four). In addition, the court found that NLB did not control the means and manner of plaintiff's work since plaintiff did not require training and, in fact, had fifteen years of experience in recruiting (factors one and two). The court also found that neither NLB nor Cognizant exercised any oversight or provided any instruction to plaintiff. The court further found that plaintiff did not receive annual leave, did not accrue retirement benefits, and that neither entity paid Social Security taxes on her behalf, and that her project term was limited in duration (factors five, eight, ten, and eleven).

In sum, the motion court concluded that the Pukowsky factors demonstrated that plaintiff was an independent contractor and, therefore, defendants were entitled to summary judgment. Despite granting summary judgment in defendants' favor, the court nevertheless addressed plaintiff's LAD claims and concluded that the allegations of inappropriate touching did not rise to the level of severe or pervasive conduct necessary to establish sexual harassment and hostile work environment claims.

In addition, the court determined that plaintiff had not established that her termination was pretextual. The court noted that, aside from plaintiff's

17

testimony, there was no evidence that she disclosed her husband's ownership interest in Staffing Idea. Rather, the court found the record supported defendants' account that they discovered plaintiff "was engaging in what could be perceived as fraudulent conduct" and immediately terminated her. In sum, even if there had been an employer-employee relationship, the court concluded that plaintiff could not establish a claim for retaliation. Plaintiff moved for reconsideration, which the court subsequently denied.

Plaintiff appealed.

II.

An appellate court reviews the grant of summary judgment de novo, applying the same standard used by the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022); see also Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Rule 4:46-2(c) states that summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." An issue of fact is genuine if, when viewed in the light most favorable to the non-moving party, it is sufficient to allow a factfinder to resolve the issue in favor of the non-moving party. Brill, 142 N.J. at 540.

18

The appellate court "owes no special deference to the motion judge's legal analysis." Russi v. City of Newark, 470 N.J. Super. 615, 620 (App. Div. 2022).

If "the evidence 'is so one-sided that one party must prevail as a matter of law,' . . . the trial court should not hesitate to grant summary judgment." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)); see also Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Unsupported and bald assertions are insufficient to defeat summary judgment. Ridge at Back Brook, LLC v. Klenert, 437 N.J. Super. 90, 97-98 (App. Div. 2014).

III.

Plaintiff argues the motion court erred by granting summary judgment on her LAD claims by concluding she was an independent contractor rather than an employee, by improperly resolving disputed issues of fact in defendants' favor, and by dismissing her claims for discrimination, sexual harassment, hostile work environment, and retaliation.

The LAD prohibits employers from engaging in unlawful discrimination against employees on the basis of sex, among other protected categories, and bars sexual harassment that is sufficiently severe or pervasive to alter the conditions of employment and create a hostile work environment. N.J.S.A. 10:5-12; Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603-04 (1993).

The LAD likewise makes it unlawful for

> an employer, because of the . . . sex, gender identity or expression, . . . of any individual, . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .
>
> [N.J.S.A. 10:5-12(a).]

Our courts have stated that the LAD's provisions should be broadly interpreted, as its purpose is to eradicate "'the cancer of discrimination' in our society." Richter v. Oakland Bd. of Educ., 246 N.J. 507, 537 (2021) (quoting Smith v. Millville Rescue Squad, 225 N.J. 373, 390 (2016)).

The existence of an employment relationship between the parties is a prerequisite to establishing liability under the LAD. Thomas v. Cnty. of Camden, 386 N.J. Super. 582, 594 (App. Div. 2006); see also, e.g., Palmisano v. State Admin. Off. of the Courts, 482 N.J. Super. 328, 335 (App. Div. 2025)

20

(quoting Thomas for the proposition that "the lack of an employment relationship between the plaintiff and the defendant will preclude liability").

Significantly, in Pukowsky, we held that "independent contractors are not to be considered 'employees' within the meaning of the LAD, and are therefore not entitled to avail themselves of its protections." 312 N.J. Super. at 180. To determine whether an individual is an employee or an independent contractor for purposes of the LAD, we adopted the following twelve-part "totality of the circumstances" test, requiring consideration of the following:

> (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation–supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.
>
> [Id. at 182-83 (quoting Franz v. Raymond Eisenhardt & Sons, 732 F. Supp. 521, 528 (D.N.J. 1990)).]

The court also synthesized the twelve Pukowsky factors into three categories: "(1) employer control; (2) the worker's economic dependence on the work relationship; and (3) the degree to which there has been a functional

integration of the employer's business with that of the person doing the work at issue." Ibid.

As recently as 2015, the Supreme Court credited Pukowsky's holding, noting that "an independent contractor is not protected by the [LAD]." Hargrove v. Sleepy's, LLC, 220 N.J. 289, 309 (2015). The Court also reaffirmed its holding in D'Annunzio v. Prudential Ins. Co. of Am., 192 N.J. 110 (2007), stating that Pukowsky's twelve-factor totality of the circumstances test still applied to cases brought under the LAD. Hargrove, 220 N.J. at 315-16.

In D'Annunzio, 192 N.J. at 125, the Court stated that this factor looks to "whether the professional's services have been incorporated into the work of the business." The Court stated that this issue raises several questions:

> Has the worker become one of the "cogs" in the employer's enterprise? Is the work continuous and directly required for the employer's business to be carried out, as opposed to intermittent and peripheral? Is the professional routinely or regularly at the disposal of the employer to perform a portion of the employer's work, as opposed to being available to the public for professional services on his or her own terms? Do the "professional" services include a duty to perform routine or administrative activities? If so, an employer-employee relationship more likely has been established.
>
> [Id. at 123-24.]

There, the Court noted that the plaintiff's work was an "essential" aspect of the employer's business and "necessary" to its "day-to-day operations." Id. at 126. Eight years later, in Estate of Kotsovska, ex rel. Kotsovska v. Liebman, 221 N.J. 568, 598 (2015), the Court noted that "[t]his factor addresses a situation where the employer, who runs a business composed of two or more overlapping operations, subcontracts a portion of the work in furtherance of his or her core business."

The Court in D'Annunzio emphasized that the worker's integration in an employer's business operations is an important consideration for determining whether an employee's status as an independent contractor is appropriate. 192 N.J. at 125. In assessing this consideration, the D'Annunzio Court concluded that the plaintiff's work was an "essential" component of the defendant's business and "necessary" to its day-to-day operations. Id. at 126.

In analyzing those factors, our Court clarified that the standard for these factors is whether a reasonable jury could find, based on the facts presented, that the plaintiff was an employee. Even if one of the factors indicates an employee relationship, the issue is whether "the overwhelming balance of factors clearly supports" a finding that the plaintiff is not an employee. Pukowsky, 312 N.J. Super. at 183. In other words, courts must "weigh the factors qualitatively rather

23

than quantitatively." Hoag v. Brown, 397 N.J. Super. 34, 48 (App. Div. 2007) (emphasis added). We further stated that applying the Pukowsky factors "requires more than the listing of factors on either side of the ledger with victory going to the side garnering the most factors." Chrisanthis v. Cnty. of Atl., 361 N.J. Super. 448, 456 (App. Div. 2003). Our case law has identified "[t]he most important of these factors [to be] the first, the employer's right to control the means and manner of the worker's performance." Id. at 455 (quoting Franz v. Raymond Eisenhardt & Sons, Inc., 732 F. Supp. 521, 528 (D.N.J. 1990)). However, it is also well-settled that the weight assigned to each factor depends on the circumstances of the individual case. Id. at 456 ("A 'principled application' of the factors and a consideration of which factors are more important under the peculiar circumstances of each case [is] required").

Applying these legal principles and based on our de novo review, we agree that the Pukowsky factors overwhelmingly support plaintiff's status as an independent contractor and reject plaintiff's claim that she was an employee of either defendant entitled to the protections of the LAD. We reach this conclusion following our review and application of the Pukowsky factors, bearing in mind plaintiff's admission that, from the outset, she understood she

24

was not an employee but an independent contractor and it was her company that had been retained to perform the work.

As to the level of control (factor one), plaintiff argues that her designation as an independent contractor "was functionally arbitrary within [d]efendants' business," that this is the most important factor, and that the court erred by commencing its analysis with the twelfth factor, the intention of the parties.

We, however, find no legal support for plaintiff's contention that the motion court erred merely by examining the Pukowsky factors in reverse or in a different sequence. Plaintiff points to Cognizant's direction of her day-to-day activities and its monitoring of how she performed her recruitment duties. According to plaintiff's own testimony, however, Chopra informed her of vacancies at Cognizant that needed to be filled and she was free to contact potential recruits, conduct interviews and if she found them qualified, pass them along to Cognizant's internal team. Cognizant, therefore, did not direct how plaintiff could perform her work. Additionally, the record also shows that plaintiff worked for Cognizant as one of several technology recruiters, providing a pathway for technology experts to be hired to work for the company itself. As plaintiff described her responsibilities, she would review resumes, conduct

25

screening interviews, and, if the candidates appeared qualified, arrange interviews with Cognizant's internal teams.

We discern Cognizant and NLB's supervision of plaintiff mirrors that of any entity providing guidance regarding services to be performed. Importantly, the record shows that plaintiff could not participate in Cognizant's benefit plans, and Cognizant had "no responsibility for any employer-related functions . . . , including supervising, disciplining, discharging, reviewing, evaluating, and setting the pay rates" for plaintiff's work. Under these circumstances, we are unpersuaded that the level of control plaintiff argues Cognizant asserted outweighs the remaining Pukowsky factors, which weigh in favor of independent contractor status.

Moreover, to the extent plaintiff is arguing NLB asserted control over her work, we observe no support for this contention in the record, as it was Cognizant's staff who supervised plaintiff's work and provided her with the equipment and office space.

Plaintiff next asserts "[o]ther Pukowsky factors also weigh in favor of employment," including the second and fourth factors (the kind of supervision and who furnishes any equipment) respectively. Although Chopra supervised plaintiff, it is the "kind" of supervision that we must examine. 312 N.J. Super.

26

at 182. Plaintiff fails to explain how Chopra's supervision established an employment relationship with Cognizant or NLB, as independent contractors may also be supervised by the entity that hires them.

Although Cognizant furnished plaintiff with an email account and equipment, plaintiff does not explain how this fact is sufficient, particularly in light of her deposition testimony that she understood she had been retained as an independent contractor, did not have a designated office or specific workspace, worked from any vacant cubicle on the days she chose to come into the office, and, as defendants argue, that these accoutrements "were not necessary to her recruiting business as [plaintiff] had an established business providing these same services prior to her company's contracts with Cognizant and NLB."

Additionally, as Cognizant asserts, with respect to the length of time plaintiff worked for Cognizant and NLB (fifth factor), "it is undisputed that [plaintiff's] contract had a limited [twelve]-month duration," reflecting a finite period of time, which is consistent with plaintiff's status as an independent contractor, not an employee.

A-0592-24

As to the method of payment (factor six) which plaintiff does not address in her brief, it is undisputed that Cognizant compensated plaintiff through Mirosoft, rather than issuing her a W-2 as it would for an employee.

Regarding the manner of termination of the work relationship (factor seven), plaintiff inexplicably focuses on the hiring process undertaken by Cognizant, arguing that the "hiring process also indicates that she was a 'potential' employee . . . seeking to enter into a commercial transaction." This argument is without merit as it fails to address the manner of termination.

Lastly, in addressing whether the work is an integral part of the employer's business (factor nine), plaintiff maintains "[t]here is also evidence in the record that the work performed by [her], recruiting for positions within the company, is integral to [d]efendants' business . . . as it was also performed by Cognizant employees." On this point, we note that plaintiff was one of between ten and fourteen recruiters with Cognizant, which is more indicative of the fact that her work was "incidental" to Cognizant's overall business in the information technology industry, rather than integral or essential. See Chrisanthis, 361 N.J. Super. at 461-62 (finding the plaintiff's work as a nurse was "incidental, not integral" to the defendant's operation as a correctional facility, because the services were ancillary to the institution's primary purpose).

Having examined the relevant <u>Pukowsky</u> factors in light of this record, we conclude, as the motion court did, that no reasonable jury could find that plaintiff was an employee of Cognizant and NLB. Critically, the parties' contractual agreements expressly designate plaintiff as an independent contractor, not an employee, and provided that Mirosoft, plaintiff's company, would be responsible for paying its employees' salaries, withholding income taxes and Social Security payments, and administering disability benefits. Plaintiff cannot defeat summary judgment in light of the express language of the Agency and related agreements, as well as her own testimony acknowledging that she understood she had been retained as an independent contractor. Plaintiff's contention that she should be treated as an employee notwithstanding the plain language of these agreements is unavailing. Under these circumstances, the court correctly determined plaintiff was an independent contractor and granted summary judgment in defendants' favor.

IV.

Because we have determined that plaintiff was an independent contractor and not an employee of Cognizant or NLB, we need not reach plaintiff's discrimination claims specified in her complaint. <u>Hargrove</u>, 220 N.J. at 309. It is axiomatic that our LAD and its broad protections apply solely to employees,

29

not independent contractors, who may have other causes of action against alleged tortfeasors, including for breach of contract and the like, where appropriate. Nonetheless, considering the stated legal authorities, we affirm the dismissal of plaintiff's complaint and all claims brought pursuant to the LAD.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division